UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | | |
|---|---|---|
| CAIN STOREY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE No. |
| -v- | ) | _____ |
| | ) | |
| FLOYD COUNTY, GEORGIA; | ) | |
| DAVID STEWART, in his | ) | |
| individual capacity; CALEB H. | ) | (Jury Trial Demanded) |
| RATCLIFF, as the Administrator of | ) | |
| the Estate of Dallas Battle, deceased, | ) | |
| in his individual capacity; | ) | |
| MARK WALLACE, in his individual | ) | |
| capacity; CRAIG BURNES, in his | ) | |
| individual capacity; jointly and | ) | |
| severally, | ) | |
| Defendants. | | |

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, CAIN STOREY, by and through his attorneys,

and files his Complaint against the Defendants, FLOYD COUNTY, GEORGIA

("Floyd County"); CALEB. H. RATCLIFF, Administrator of the Estate of Dallas

Battle, deceased ("Battle"), in his individual capacity; DAVID STEWART

("Stewart") in his individual capacity; MARK WALLACE ("Wallace") in his

individual capacity; and CRAIG BURNES, ("Burnes") in his individual capacity,

in this civil action, stating unto this Court as follows:

1.     This is an action for damages brought pursuant to 42 U.S.C. §§ 1983

and 1988, the Fourth and Fourteenth Amendment to the United States Constitution, and the statutes and common law of the State of Georgia, against Defendants.

2. Jurisdiction is founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

3. Venue is proper pursuant to 28 U.S.C. § 1391(d), as the situs of the incident was Rome, Georgia, within the Northern District of Georgia.

4. At all times, Cain Storey was a Georgia citizen residing in the state.

5. Defendant Floyd County is a municipal corporation organized under the laws of the State of Georgia. The Floyd County Police Department ("FCPD") is, and was at all relevant times, a department of Defendant Floyd County.  Upon information and belief, Floyd County has purchased and maintained applicable policies of liability insurance and has thereby waived governmental immunity that might otherwise be available to Floyd County and its personnel and officials, including but not limited to those employed with the FCPD.

6. Upon information and belief, Dallas H. Battle ("Battle") died on March 5, 2021, and no estate was established for him.  A petition to open an estate for Battle has been requested, asking that the County Administrator, attorney Caleb H. Ratliff, be appointed as administrator of the Estate of Dallas H. Battle.  Plaintiff anticipates that the County Administrator will, in accordance with O.C.G.A. § 53-6-40, be appointed to accept service on behalf of the Battle estate.  At all relevant times, Battle was employed as a police officer and investigator with the FCPD and

2

was acting under color of law and within the scope of his employment with Floyd County and the FCPD.

7.      Stewart is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Stewart was employed as a police officer and investigator with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD.

8.      Wallace is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Wallace was employed as a police officer and investigator with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD.

9.      Burnes is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Burnes was the duly elected Coroner for Floyd County, served as an official and employee of Floyd County, and acted within the scope of his employment and office as Coroner of Floyd County.

## <u>GENERAL ALLEGATIONS</u>

10.      On October 18, 1996, shortly after 9:00 p.m., Plaintiff went to his close friend, Brian Bowling's, house to visit. At the house were Brian's parents, his sister, Amanda, her boyfriend, Kenneth, and two of Brian's friends, Wayne and Charlie Childers, all of whom were in the living room watching television.

11.    Brian was in his bedroom when Cain stopped by.  Cain went into Brian's room where Brian was listening to music.

12.    Cain brought with him a .38-caliber Smith & Wesson revolver handgun that belonged to Cain's father.  He showed the handgun to Brian.

13.    When Brian asked if he had any bullets, Cain produced a bullet he had in his pocket and gave it to Brian, who was on the telephone with his girlfriend, Caprice Hiott.  Brian took the bullet and loaded it into the gun.  He told Caprice he was "playing with Josh's gun."

14.    Brian Bowling, 15, then proceeded to play Russian Roulette with the pistol, but was "cheating" because he could see there was no round in the firing chamber.  Plaintiff, only 17, also proceeded to play Russian Roulette and "dry firing" the gun because he could see there was no bullet in the firing chamber.

15.    Cain handed the revolver back to Brian, who spun the chamber and told Caprice that he was playing Russian Roulette.  Cain then urged Brian to stop, telling him, "Don't do it man, I think it's the one."  Tragically, Brian pulled the trigger and the handgun fired, sending a bullet into Brian's right temple.

16.    Hearing a loud noise, Brian's family ran to the bedroom, where they saw Brian slumped against his bed, bleeding from his head wound.  Cain excitedly yelled, "My God, he shot himself in the head!"  He continued to yell, "He just took the gun, put it to his head and shot hisself [sic]!"

4

17.     Floyd County Police Department officers and an EMS crew from the Rome Fire Department responded to the scene.  Defendant Battle, responded to the scene to begin the investigation. He would be the lead detective in the case.[1]

18.     Battle received field notes from FCPD Officer Carl Lively who had spoken to Storey.[2]

19.     Battle spoke to Plaintiff, who told Battle that "Brian had shot hisself [sic]."

20.     Battle also took possession of the handgun, the spent casing in the chamber, and a bullet Plaintiff had given to Kenneth Floyd earlier, when emergency personnel were trying to determine the caliber of the bullet involved in the incident.[3]

21.     That night, while Brian Bowling was in the hospital, Plaintiff was taken to the Floyd County Police Department, where he was interrogated.  The interrogation was not recorded, and there were no notes or reports to reflect the question-and-answer session.

---

[1]  As will be learned in discovery, Battle led what can only be described as an inept and incompetent crime scene investigation.  Thus, valuable evidence that would have exculpated Plaintiff from the murder charge was not obtained or preserved.

[2]  P.O. Lively's field notes were never produced in the criminal case.

[3]  Only the handgun was placed into evidence.  Battle apparently lost the casing and bullet.

22.     Plaintiff was administered a gunshot residue test ("GSR"), which came back "negative."  Inexplicably, no GSR test was ever requested for Brian Bowling, despite the evidence that he had accidentally shot himself from close range while playing Russian Roulette.

23.     Brian Bowling's girlfriend, Caprice Hiott, was interviewed by Battle and Defendant Wallace on October 20, 1996.  She told the detective that Brian's last statement to her was that he was playing Russian Roulette.  She also told the police that Brian's sister, Amanda, told her that Brian had shot himself in the head.

24.     The only reasonable conclusion that any trained detective could have arrived at was that the shooting was a tragic accident, and no more.

25.     On October 20, 1996, Battle and Coroner Burnes met at the funeral home where Brian Bowling's body had been sent from the hospital following his death.

26.     Burnes, the elected Coroner, did not possess a medical degree. Although he was legally authorized to order an autopsy to be performed, he chose not to do so.  He also chose not to contact a medical examiner to consult on the case.

27.     Burnes, as was his habit between 1996 and 1998, told the Bowling family that their son's body had been sent to the Georgia Bureau of Investigation's Crime Lab for an autopsy.  It had not.  Yet, Burnes billed the Bowling family

approximately $7,000 for the never-performed autopsy.[4]

28.    In the Bowling case, Burnes went so far as to place rods into the entrance and exit wounds in Brian Bowling's skull in a an amateurish "experiment" to determine the path of the bullet.  Burnes had no training or expertise in ballistics, forensic pathology, or body kinematics to provide any technical foundation for the macabre experiment.

29.    On October 20, 1996, Battle and Wallace interrogated Plaintiff for hours at the FCPD.  Storey, then 17, and without the benefit of counsel or a parent, repeatedly told the detectives that Bowling had shot himself in the head while playing Russian Roulette.

30.    Battle and Wallace made the illusory promise that if Plaintiff just admitted that he accidentally shot his friend, the case would be closed.

31.    After being pressured over and over again, Plaintiff finally acquiesced to what the detectives told him had occurred:  Cain accidentally shot Brian.

32.    Immediately after telling the detectives what they wanted to hear, the promise that case would be closed disappeared, and Plaintiff was arrested for involuntary manslaughter.

33.    Defendants' investigation soon turned more sinister, as they did not

---

[4]  Another common scheme was to bill families for autopsies performed by others, for which there had been no charge.  Burnes simply pocketed the money.

rest on the involuntary manslaughter charge.

### The Free Birds

34.     Battle and Stewart began to fabricate a motive that Brian Bowling's death was not an accident.  Instead, it was the penalty for snitching on Plaintiff and his friend, Darrell Clark, who Battle and Stewart claimed were members of a gang called the Free Birds.

35.     Battle and Stewart planted the seeds of a revenge murder with the Bowling family, going so far as to have the family authorize the exhuming of Brian Bowling's casket to review a letter placed in the casket by a friend of Brian's, Joseph Wilkins.  The letter, a fond remembrance, stated, *"Brian, we're going to miss you.  Fly high! With sweet love, the Free Birds.  P.S. See you at the Crossroads!"*

36.     Present at the exhumation were Defendants Wallace and Battle, Capt. Tommy Shiflett, and Sgt. Greg Carney.  Battle took possession of Joseph Wilkins' drawing.

37.     Battle altered the drawing to add the term "NARCS" with a diagonal line drawn through it, to represent the message "Don't be a rat to the police."

38.     Battle did not disclose his alteration of the drawing to the prosecutor on the Storey/Clark case before trial.

39.     With the altered drawing, Battle and Stewart had a motive for the

killing they could present to the jury.

40.    Battle and Stewart then spread rumors that the Free Birds was a gang
to which Storey and Clark belonged, and the letter was a "calling card," or
message, of retribution.  Rumors, fueled by Battle and Stewart, suggested that
Bowling was killed by Storey and Clark because he was a "rat" who snitched on
Storey and Clark to the police in connection with the theft of a safe and money
from Storey's father's house three weeks earlier.

### Angela Bruce

41.    Battle and Stewart threatened and coerced a single mother, Angela
Bruce, into testifying that Storey and Clark were at her house a few months after
Bowling's death.  There, Storey allegedly bragged about how he and Clark placed
a pillow over Bowling's head and shot him, execution style, because the Free Birds
gang did not let anyone out alive.

42.    Despite there being numerous interviews with Bruce, only two were
recorded.

43.    Battle and Stewart told Bruce they were aware of a party she held in
February 1997, where there was underage drinking.  During several visits, often
late at night, they threatened Bruce with losing custody of her minor children if she
did not cooperate.  Battle also coerced her into a sexual relationship during the
investigation, a fact he did not disclose to the prosecutor before trial.

44.     Battle and Stewart further coached Bruce into implicating 15-year-old Caprice Hiott, Brian's girlfriend.  Bruce, having been threatened and coerced into providing a false story, followed the Battle/Stewart playbook.  She provided a statement and testimony that Storey bragged that Caprice kept Brian on the phone and sent a code, via a pager, to let Clark and Storey know Brian was home, so they could carry out the killing.

45.     The Angela Bruce story was completely untrue; it was fabricated and manufactured by Battle and Stewart to manufacture probable cause for Plaintiff and Clark's arrest for murder and conspiracy to commit murder.

46.     Bruce's second formal statement, on May 22, 1997, which implicated Caprice Hiott, provided the catalyst to support arrest warrants for Plaintiff and Darrell Clark for murder and conspiracy to commit murder.

47.     Battle and Stewart withheld from the prosecutor several witness statements that contradicted Angela Bruce's testimony and contradicted the "Free Birds gang" narrative, as well as reports and field notes by FCPO officers that supported the "accidental shooting while playing Russian Roulette" narrative.

**Charlie Childers' "statement" implicating Darrell Clark**

48.     Battle and Stewart sought out Wayne and Charlie Childers, both of whom were at the Bowling house at the time of the murder but had never been interviewed.

49.    Battle and Stewart both knew that Charlie Childers was hearing impaired and had never learned American Sign Language (ASL). They also knew that Charlie Childers read at an approximate 2nd-grade level and that Wayne Childers was illiterate.  Since neither individual knew ASL, Wayne and Charlie could only communicate with basic "home signs" the Childers family had developed to help understand and communicate with Charlie.

50.    Battle and Stewart met with Wayne and Charlie Childers on two occasions on May 26, 1997.  They claimed that Charlie saw a boy run in front of the Bowling residence immediately after the shooting.  The second meeting purportedly produced Charlie Childers' identification of Darrell Clark as the boy he saw running by the house after the shooting.

51.    The entire Charlie Childers' story and identification was fabricated by Battle and Stewart.  Childers did not see anyone running by the Bowling house that evening.

52.    Childers' purported identification of Darrell Clark on a photo array was used at trial by the prosecution through Battle's testimony, thus cementing Clark's presence and role in the killing.

53.    On January 19, 1998, based on Defendants' fabricated evidence and their withholding of material exculpatory and impeachment evidence, Plaintiff and Darrell Clark were convicted of murder and conspiracy to commit murder.  They

11

were later sentenced to serve life in prison.

54.    But for Defendants' conduct, as set forth below, there would have

been no probable cause for Plaintiff to be charged with any crimes, much less

murder and conspiracy to commit murder.

## POST-CONVICTION INVESTIGATION

55.    Following years of unsuccessful appeals, podcasters and documentary

filmmakers Susan Simpson and Jacinda Davis conducted an independent

investigation into the Cain Storey/Darrell Clark case.

56.    The Simpson/Davis investigation revealed the following incredible

evidence:

a.    Angela Bruce was coerced by **Battle** and **Stewart** to testify about Cain Storey admitting details of the crime because they threatened to take away her children.  She also succumbed to **Battle**'s sexual advances during the investigation because of the same threats and coercion.

b.    **Battle** engaged in a sexual relationship with the victim's aunt, Melody Robinson, compromising the integrity of the investigation and providing an incentive for him to pursue murder charges against Story and Clark.

c.    Charlie Childers never reported to **Battle** and **Stewart** that he observed Darrell Clark outside the Bowling home near the time of the shooting.

d.    **Battle** altered the Joseph Wilkins drawing that was placed in Brian Bowling's casket to add "NARCS" and a circle with a diagonal line to further the theory that Bowing was executed for allegedly ratting out Storey and Clark to police about the theft of money from Storey's

father's safe.

e.   That Coroner **Burnes** had been committing crimes as early as January 16, 1996, and continuing through the course of the Storey/Clark criminal proceedings involving insurance fraud and threatening to take official action (e.g., identifying a cause of death as suicide or suggesting foul play) based on what personal benefit might inure to him.[5]

f.   **Burnes** defrauded families of money paid to him to perform an autopsy where he did not perform any autopsy (as occurred in the instant case).

g.   Other acts of commission and omission that will be discovered during the course of the lawsuit.

57.   On December 8, 2022, based on the newly-discovered evidence outlined in Plaintiff's Extraordinary Motion for New Trial and a similar motion filed by his Co-Defendant, Darrell Clark, Floyd County District Court judge John Niedrach vacated Plaintiff's convictions and dismissed criminal charges.

58.   **Plaintiff's wrongful incarceration in jail and prison, from October 20, 1996, to December 8, 2022, totaled 9,546 days, or 26 years, 1 month, and 18 days.**

59.   Defendants' misconduct, as set forth herein, was a direct and proximate cause of Plaintiff, CAIN STOREY's, injuries and damages:

a.   Suffering a deprivation of liberty by being wrongfully

---

[5] On August 26, 1999, less than one year after Plaintiff's conviction, Burnes pled guilty to more than thirty felony counts of theft and fraud offenses and was sentenced to serve five years in prison.

seized, incarcerated and imprisoned for a period of over 26 years, including significant time spent in solitary confinement;

b.  Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged and convicted of murder and conspiracy to commit murder, and facing life in prison without the possibility of parole; a real-life death sentence;

c.  Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d.  Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e.  Loss of enjoyment of daily activities including, but not limited to, seeing his children grow into adults;

f.  Not being able to attend the funerals of family members;

g.  Physical injuries suffered in prison;

h.  Loss of employment opportunity, past income and future earning capacity;

i.  Physical injuries while being imprisoned, including being assaulted;

j.  Loss of employment opportunity, past income and future earning capacity;

k.  Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

l.   Many of Plaintiff's injuries and damages are likely to be permanent;

m.   Other damages which may be revealed through discovery.

## COUNT I

### 42 U.S.C. § 1983 CLAIM FOR FOURTEENTH AMENDMENT DUE PROCESS VIOLATIONS – FABRICATION OF FALSE INCULPATORY EVIDENCE

(Against Defendants Battle, Stewart, and Wallace
in their Individual Capacities)

60.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein.

61.   In the manner fully described above, Defendants Battle, Stewart, and Wallace, knowingly fabricated false inculpatory evidence to manufacture probable cause for Plaintiff's arrest and ultimate conviction.

62.   Defendants' misconduct includes the following fabrications of evidence:

a.   Defendants Battle and Wallace coerced a false admission of culpability for Bowling's death from Cain Storey and thereby fabricated evidence that the shooting was not self-inflicted.  The statement attributed to Cain in which he was pressured to say that the gun was in his hand at the time it was discharged was a key piece of the conspiracy case manufactured by Defendants and was presented to the jury.

b.   Defendants Battle and Stewart coerced a false statement from Angela Bruce in which she falsely claimed that

15

Darrell Clark and Cain Storey boasted about a gang-related, "execution style," revenge killing of Bowling. This fabricated witness account, invented and coerced by Defendants, served as the basis for the institution of murder and conspiracy charges against Clark and Cain and was also critical evidence, albeit false, that was presented to the jury.

c.   Defendants Battle and Stewart created false evidence in the form of witness identification documents attributed to Angela Bruce which were used in the prosecution of Storey and Clark to further the fabricated story that they attended a party at Angela's home and boasted about the Bowling murder.

d.   Defendants Battle and Stewart created a false account to be attributed to Charlie Childers about seeing Clark outside the Bowling home on the night that Bowling was shot, and fabricated witness identification documents. Defendants caused both the documents and the fabricated story to be used in the prosecution of Clark and to be presented to the jury in furtherance of the conspiracy claim.

e.   Defendant Battle fabricated evidence by adding the "no narcs" message to the Joseph Wilkins's drawing removed from Bowling's casket on or about November 21, 1998. Upon information and belief, he did so with the knowledge and assent of Defendants Stewart and Wallace and this false evidence was used at trial and throughout the criminal prosecution of Storey and Clark to bolster the fabricated narrative of a violent gang with a "Code" calling for the execution of any member who spoke to the police.

f.   Defendants Battle and Stewart, with the knowledge and assent of Defendant Wallace, created and published, both to the public and to the DA's Office and the court, the false and fabricated evidence that Storey and Clark either fled (in the case of Storey) and were about to flee (Clark)

the State of Georgia with knowledge that said false information would affect public perception in this high profile case.

g.    Defendants Battle and Stewart, with the knowledge and assent of Defendant Wallace, actively enticed and recruited jailhouse informants to make statements incriminating Storey and Clark in Bowling's death, even though they knew the statements were false. Upon information and belief, these fabricated statements comprised part of the case presented to the grand jury and thus contributed to the institution of criminal charges against Plaintiff.

h.    In other respects to be proved through discovery and at trial.

63.    Defendants' fabrication of evidence clearly affected the decision of the jury, as the centerpiece of the State's case was Angela Bruce's testimony about Plaintiff's admissions, the playing of the Storey "confession" tape,[6] the "No Narc/Free Birds" motive for the killing, and testimony about Charlie Childers' identification of Darrell Clark.

64.    It was clearly established in 1996 and earlier that the fabrication of evidence as alleged herein was unlawful and violated a criminal defendant's right to be free from fabricated evidence contributing to a criminal conviction.

65.    Absent the fabrication of evidence by Defendants, the arrest and prosecution of Plaintiff could not and would not have been pursued, and Plaintiff

---

[6]  Regardless of the trial court's ruling the tape inadmissible after the jury heard the "confession," one cannot un-ring the bell of a confession.

would not have been convicted.

66.    All of the foregoing acts were committed under color of state law and violated clearly established law of which any reasonable law enforcement officer would have known.

67.    Defendants' fabrication of false inculpatory evidence directly and proximately caused Plaintiff's wrongful arrest, conviction, and deprivation of liberty without due process of law for over 26 years, as well as the physical, emotional, psychological, and pecuniary injuries described in this Complaint and to be proved through discovery and at trial.

## COUNT II

### 42 U.S.C. § 1983 CLAIM FOR FOURTEENTH AMENDMENT VIOLATIONS – CONCEALMENT OF EXCULPATORY AND IMPEACHMENT  (“*BRADY*”) EVIDENCE

(Against Defendants Battle, Stewart, and Wallace
in their Individual Capacities)

68.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

69.    Defendants Battle, Stewart, and Wallace deliberately, intentionally, recklessly or inadvertently failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

70.    These Defendants deprived Plaintiff of his clearly established

constitutional right to due process of law and fair criminal proceedings by not

disclosing exculpatory and impeachment evidence to the District Attorney,

including but not limited to the following:

a.   Defendants concealed numerous witness interviews and notes and reports related to same which contradicted and undercut the story told by Angela Bruce at Defendants' urging and because of their coercion of her. Defendants concealed all evidence they obtained which would prove the falsity of the story they had fed to Angela.

b.   Defendants concealed their notes and reports related to the numerous occasions on which Defendants Battle and Stewart met with Angela Bruce pursuant to their efforts to obtain some inculpatory statement from her. The notes and other materials related to these other meetings would have demonstrated that Angela originally (and truthfully) denied any knowledge about Clark, any supposed "Free Birds gang," or Bowling's death.

c.   Defendants concealed numerous witness interviews and notes and reports related to same which contradicted and undercut Defendants' narrative regarding the existence of a "gang" called the Free Birds.

d.   Defendants concealed the notes and reports related to same regarding the veracity of Clark's alibi claim for the evening of October 18, 1996. Upon information and belief, these Defendants obtained corroboration that Clark was miles away from the Bowling home and at his apartment in Lindale at the time Bowling was shot.

e.   Defendants concealed the fact that Defendant Battle was engaged in an extramarital affair with Bowling's aunt during the FCPD's investigation into the circumstances of his death and that, as a result, Battle had an incentive to pursue criminal charges against Plaintiff despite the lack of any evidence to support such charges.

f.   Defendants concealed their notes, writings, and reports from interviews conducted on the night of October 18, 1996, including but not limited to those of Cain Storey and Caprice Hiott, which corroborated Cain's account that the gun was in Bowling's hand at the time the fatal shot was fired.

g.   Defendants concealed their knowledge that Bowling's fatal wound was from close range and consistent with the Russian Roulette scenario described by witnesses including Cain Story and Caprice Hiott.

h.   Defendants concealed the fact that Defendant, Battle, was involved in a sexual relationship with Angela Bruce during the investigation, which would have called into question the good faith of the criminal investigation and impeached Battle's and Bruce's credibility.

i.   In other respects to be proved through discovery and at trial.

71.   A police officer's *Brady* obligation to disclose material exculpatory and impeachment evidence, regardless of whether it is reduced to writing, was clearly established long before Plaintiff's 1998 criminal trial.

72.   Defendants' failure to disclose exculpatory and impeachment evidence as described in this Complaint deprived Plaintiff of his right to a fair criminal process and his constitutional right to due process under the Fourteenth Amendment.

## COUNT III

## 42 U.S.C. § 1983 CLAIM FOR FOURTH AND FOURTEENTH AMENDMENT VIOLATION – MALICIOUS PROSECUTION

(Against Defendants Battle, Stewart, and Wallace
in their Individual Capacities)

73.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein.

74.    As described more fully above, Defendants Battle, Stewart, and Wallace influenced the initiation of criminal proceedings against Plaintiff with charges of murder and conspiracy to commit murder despite his actual innocence and these Defendants' knowledge that no probable cause supported the institution of criminal charges against Plaintiff.

75.    Probable cause for the criminal charges and Plaintiff's continued detention was absent but for Defendants' fabrications of evidence and false statements and material omissions of facts.

76.    The criminal prosecution against Plaintiff ended with a favorable termination on December 8, 2022, when his convictions were vacated and criminal charges dismissed.

77.    Plaintiff's right not to be charged and convicted of crimes based on fabricated evidence and false statements and/or material omissions was clearly established long before October 18, 1996, the earliest possible date of Defendants' misconduct.

**COUNT IV**

## 42 U.S.C. § 1983 CLAIM FOR FOURTEENTH
## <u>AMENDMENT VIOLATIONS – CIVIL CONSPIRACY</u>

(Against Defendants Battle, Stewart, Wallace, and Burnes
in their Individual Capacities)

78.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

79.    During the investigation of Bowling's death, FCPD detectives Battle, Stewart, and Wallace, knowingly conspired with Burnes to violate Plaintiff's constitutional rights, including his Fourteenth Amendment rights to a fair trial and due process of law. These Defendants reached an agreement amongst themselves to conceal evidence indicating that the subject fatal gunshot was self-inflicted and/or accidental, and to conceal evidence which would have demonstrated that Plaintiff had nothing to do with Bowling's death.

80.    In furtherance of the conspiracy to conceal evidence relating to the circumstances and true facts surrounding the gunshot that resulted in Bowling's death, Defendants Battle, Stewart, Wallace, and Burnes undertook the following overt acts:

       a.    Defendants Battle and Burnes met on October 20, 1996, to view Bowling's body. Defendant Wallace either attended this meeting or learned of the details soon thereafter. All knew that Bowling had suffered a contact gunshot wound, as evidenced by powder burns on his right temple. Despite that knowledge, these Defendants agreed to and set about to conceal all evidence of a contact wound.

22

b.  Defendant Burnes falsely led the Bowling family to believe that an autopsy was performed on Bowling's body. He falsely represented that the body had been sent to the GBI Crime Lab for autopsy, when Burnes knew that was not so. The FCPD Defendants were aware of this fabrication and assented to and condoned it toward the end that the narrative of a "distance" shot could be advanced.

c.  Defendant Burnes and the FCPD Defendants consciously and deliberately chose not to have an autopsy done and not to have a medical examiner consulted because they knew that taking either of those steps would have shown that Bowling suffered a close-range or contact gunshot wound that was self-inflicted. Defendants collectively decided not to avail themselves of routine investigatory steps that any reasonable investigator and any reasonable coroner would have pursued.

d.  For the same reason as referenced above, these Defendants decided not to have a GSR test conducted on the victim's hands at any point in time. Defendants consciously chose to avoid any test or analysis that would have cast doubt on or disproved the story of a "distance" shot.

e.  In other respects to be proved through discovery and at trial.

81.  In furtherance of the conspiracy to violate Plaintiff's right to due process and a fair trial, Defendants Battle, Stewart, and Wallace undertook the following overt acts:

a.  Defendants Battle and Stewart coerced Angela Bruce to falsely implicate Plaintiff in Brian Bowling's death despite their knowledge that Plaintiff bore no culpability whatsoever for the subject tragic shooting and that

23

Angela had never talked to Plaintiff, much less heard him say anything about Bowling's shooting or death. Defendant Wallace either participated in these efforts or alternatively assented to and condoned them.

b.  Defendants Battle and Stewart, with either the participation or assent and condonation of Defendant Wallace, fabricated a witness statement and witness identification documents to attribute to Charlie Childers despite their knowledge that Plaintiff bore no culpability whatsoever for Bowling's death and that Charlie never indicated that he had seen Plaintiff at the Bowling home on the night of the shooting.

c.  These Defendants deliberately chose not to take any reasonable investigatory steps (i.e., GSR test of Bowling's hands, autopsy, and/or consultation with a medical examiner) that would have established that Bowling suffered a self-inflicted contact gunshot wound. Defendants further coordinated their efforts with Defendant Burnes so as to ensure that Burnes did not take or request these reasonable investigatory steps.

d.  These Defendants concealed all witness statements that contradicted their narratives about a gang, a gang "Code," and the relationship between the safe theft and Bowling's death.

e.  These Defendants deliberately propagated false stories and rumors in the community about a gang-related, execution-style murder and provided those same false accounts to local media.

f.  These Defendants pressured, coerced, and enticed jailhouse informants into making false statements implicating Plaintiff and/or Clark in Bowling's death with actual knowledge that the statements they solicited were false.

g.  These Defendants concocted a story to falsely implicate

24

Bowling's 15-year-old girlfriend, Caprice Hiott, in a supposed murder conspiracy so as to ensure that her truthful testimony would be disregarded and pursuant to their hope that they could pressure her to either not testify or to say something incriminatory as to Darrell and/or Cain to avoid any risk that she herself might face a murder charge.

h.    In other respects to be proved through discovery and at trial.

## COUNT V

## VIOLATION OF 5TH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

(Against Defendants Battle and Wallace in their Individual Capacities)

82.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

83.    At all times, Plaintiff had a constitutional right, guaranteed by the 5th Amendment, to be free from self-incrimination.

84.    Defendants Battle and Wallace violated Plaintiff's constitutional rights described above by the following misconduct:

a.    Fabricating Plaintiff's false confession, as described above; and,

b.    Using coercion, in the form of threats and illusory promises of freedom.

85.    Plaintiff's 5th Amendment right not to be a witness against himself by use of a fabricated and coerced confession was clearly established long before

25

October 20, 1996. *See United States v. Miranda*, 384 U.S. 436, 448; 86 S.Ct. 1602 (1966) ("As we have stated before, this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.") (internal citations and quotations omitted).

## COUNT VI

### 42 U.S.C. § 1983 CLAIM FOR FOURTH AND FOURTEENTH AMENDMENT VIOLATION – FABRICATION OF EVIDENCE

(Against Defendant Burnes in his Individual Capacity)

86.     Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

87.     At all times relevant to this action, Plaintiff had the right under the Fourth and Fourteenth Amendments not to be charged and convicted of a crime based on fabricated evidence created by state actors to manufacture probable cause.

88.     Defendant Burnes knowingly created a false report that the gunshot that killed Bowling was fired from a "distance" and was not a "contact" or "close" shot. At trial, Burnes elaborated and testified falsely that, based upon his supposed findings, the gun must have been at least "12 to 18 inches" from Bowling's head when fired. No evidence supported this false report, and Burnes knew it.

89.     Burnes' conclusions regarding the distance of the shot could not have been made by a coroner acting in good faith, as the physical evidence clearly

26

indicated a close range gunshot wound.

90.    Defendant Burnes' fabricated evidence affected the decision of the jury because it supported the prosecution's theory that Brian Bowling was "shot from a distance" and contradicted the defense theory that Brian Bowling accidentally shot himself from close range while playing Russian Roulette.

91.    Defendant Burnes's misconduct as alleged in this Count contributed to the wrongful institution of criminal charges against Plaintiff, as well as his seizure, and wrongful conviction.

92.    Defendant Burnes violated Plaintiff's clearly established right to be free from criminal charges and a conviction based on fabricated evidence.

<u>**COUNT VII**</u>

**42 U.S.C. § 1983 CLAIM FOR FOURTEENTH AMENDMENT VIOLATIONS – CONCEALMENT OF <u>EXCULPATORY AND IMPEACHMENT  ("*BRADY*") EVIDENCE</u>**

(Against Defendant Burnes in his Individual Capacity)

93.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

94.    Defendant Burnes deliberately, intentionally, recklessly, or inadvertently failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

95.    Defendant Burnes deprived Plaintiff of his clearly established

constitutional right to due process of law and fair criminal proceedings by not

disclosing exculpatory and impeachment evidence to the District Attorney,

including but not limited to the following:

      a.    That he fabricated evidence in his reports to indicate that the fatal gunshot wound was not from close range, which would have supported the "self-inflicted wound while playing Russian Roulette" manner of death.

      b.    That he had repeatedly committed crimes of fraud on insurance companies and families in connection with billing for autopsies that were never performed or had been performed by outside entities and never charged, thereby pocketing the money.

      c.    In other respects to be proved through discovery and at trial.

96.     A state actor's *Brady* obligation to disclose material exculpatory and

impeachment evidence, regardless of whether it is reduced to writing, was clearly

established long before Plaintiff's 1998 criminal trial.

97.      Defendant Burnes' failure to disclose exculpatory and impeachment

evidence as described in this Complaint deprived Plaintiff of his right to a fair

criminal process and his constitutional right to due process under the Fourteenth

Amendment.

## **COUNT VIII**

### **42 U.S.C. § 1983 CLAIM FOR FOURTH AND FOURTEENTH AMENDMENT VIOLATION – MALICIOUS PROSECUTION**

(Against Defendant Burnes in his Individual Capacity)

98.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

99.    At all times relevant to this action, Plaintiff had the right under the Fourth and Fourteenth Amendments not to be charged and convicted of a crime without probable cause based on fabricated evidence and false statements and material omissions by state actors.

100.   Defendant Craig Burnes was acting under color of law and in his capacity of Coroner of Floyd County when he took possession of Bowling's body on or about October 19, 1996.  Burnes had those duties and responsibilities as are imposed by law on an official fulfilling the role of county coroner.

101.   Pursuant to Georgia law, Burnes was required to properly care for Bowling's body and to undertake any necessary and reasonable inquiry to determine the cause of death since it was obviously occasioned by other than natural causes.

102.   Despite the legal obligation to see that the cause of Bowling's death was properly determined, Defendant Burnes shirked his responsibilities and took no action to ascertain the cause of Bowling's death.

103.   Defendant Burnes fabricated evidence and made false statements in his reports to suggest that the gunshot that killed Bowling was fired from a "distance" and was not a "contact" or "close" shot.  At trial, Burnes elaborated and

testified falsely that, based upon his supposed findings, the gun must have been at least "12 to 18 inches" from Bowling's head when fired.  No evidence supported this false report, and Burnes knew it.

104.   Burnes' conclusions regarding the distance of the shot were either deliberately false or based on plain incompetence, given that he was not a licensed medical doctor.

105.   Defendant Burnes met with FCPD investigators and agreed with them that the false report that Bowling was killed by a "distance" shot would become the official coroner's report regarding Bowling's death.

106.   Burnes thereafter took deliberate actions to conceal the fact that no investigation had been undertaken and no evidence supported the official coroner's report he knew would be published and used in the pursuit of criminal charges. Specifically, Burnes sought to conceal his intentional, bad faith or reckless actions as follows:

   a.   Burnes deliberately chose to not have an autopsy done, or a medical examiner consulted, because a trained professional would be able to quickly and conclusively determine that the gunshot that killed Bowling was self-inflicted and caused a contact wound.

   b.   Burnes falsely told the Bowling family that an autopsy had been performed in an effort to prevent any further inquiry into the cause of Bowling's death and to hide the fact of his intentional and bad faith, or reckless, investigation of Bowling's injuries.

c.     Burnes misrepresented his expertise and experience to conceal his intentional and bad faith, or reckless, handling of Bowling's body and review of his injuries.

d.     Burnes either destroyed or intentionally failed to make any notes or records related to his review of Bowling's injuries in an effort to frustrate or preclude any analysis of his supposed findings.

e.     Burnes repeatedly made false statements and fabricated evidence regarding a purported "packing material" to explain away the powder burns visible on Bowling's right temple.

e.     Burnes intentionally and in bad faith chose to conform his official coroner findings and subsequent trial testimony to fit the murder conspiracy narrative concocted by FCPD investigators.

107.   At all relevant times, Defendant Burnes knew that his official coroner findings would be, in part, relied upon by FCPD investigators to justify pursuit of criminal charges.  But for Burnes' fabricated evidence and false statements and/or reckless omissions of material facts, probable cause was lacking.

108.   Defendant Burnes continued to conceal his bad faith and/or reckless misconduct throughout the wrongful prosecution of Plaintiff.

109.   Defendant Burnes's misconduct as alleged in this Count contributed to the wrongful institution of criminal charges against Plaintiff, as well as his seizure, and wrongful conviction.

110.   Defendant Burnes violated Plaintiff's right to be free of a wrongful seizure and continued detention guaranteed under the Fourth and Fourteenth

31

Amendments and, thus, should share in liability for the damages and injuries

suffered by Plaintiff, including his wrongful prosecution and 26-year wrongful

incarceration.

## COUNT IX

### 42 U.S.C. § 1983 MUNICIPAL LIABILITY CLAIM FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER *MONELL V. DEP'T OF SOCIAL SERVS. OF THE CITY OF NEW YORK*, 436 U.S. 658 (1978)

(Against Defendant Floyd County – FCPD Deficiencies)

111.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully

restated herein and further alleges the following:

112.   The Floyd County Police Department was at all times relevant to this

Complaint an entity controlled and funded by Floyd County, Georgia.

113.   Upon information and belief, the Chief of Police of the FCPD was at

all times relevant to this Complaint selected by officials of Floyd County.  Upon

information and belief, Defendant Floyd County delegated the rules, procedures

and training that applied to officers employed by the FCPD.

114.   The Chief of Police of the FCPD, and/or his designee, during the

relevant time period was a final policymaker for Floyd County with regard to all

investigative, policing, and training activities of the FCPD.  The acts and omissions

of the FCPD Chief of Police and/or his designee, during the time relevant to this

Complaint, constituted the policy, custom, or pattern and practice of Floyd County.

115.    Defendant Floyd County, by and through its final policymaker(s), with deliberate indifference, created, promulgated, and maintained the following policies, customs, or patterns which deprived Plaintiff of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his liberty without due process of law and a fair criminal proceeding, as follows:

    a.    Failing to properly train, supervise and/or discipline FCPD investigators with regard to their constitutional duties not to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (vi) ignore evidence that points to the innocence of a suspect.

    b.    Encouraging, promoting, ratifying, and condoning FCPD investigators to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) destroy exculpatory evidence; (v) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (vi) ignore evidence that points to the innocence of a suspect.

    c.    Creating, promulgating, ratifying, and condoning policies, practices, and customs which allowed and encouraged FCPD investigators to solicit false witness statements and testimony by threats, coercion, and improper entreaties to individuals known to be susceptible to enticements and/or threats to make false inculpatory statements, including but not limited to inmates at the Floyd County Jail and those easily influenced and/or susceptible to threats of criminal liability.

d. Creating, promulgating, ratifying, and condoning policies, practices, and customs which encouraged FCPD investigators to not memorialize witness statements and interviews such that the FCPD investigative file provided to the DA's Office was effectively "sanitized" in such a way that it contained only materials supporting FCPD investigators' desired narrative for a particular investigation.

e. In other respects to be proved through discovery and at trial.

116. The wrongful acts and omissions that caused Plaintiff's wrongful arrest, prosecution, conviction and incarceration were carried out pursuant to Defendant Floyd County's constitutionally inadequate policies, customs, patterns or practices.

117. These governmental policies, customs or patterns and practices of Floyd County proximately and directly caused Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

118. Defendant Floyd County condoned and ratified the policies, customs, or patterns and practices of FCPD investigators at issue in this lawsuit, despite having actual knowledge that they routinely violated individuals' rights and took actions that caused wrongful arrests and prosecutions.

119. The collection and handling of evidence, including exculpatory or impeachment evidence, is a day-to-day function of police detectives, including the individual defendants.

120.   Report writing and interviewing witnesses to crimes is a day-to-day function of police detectives, including the individual defendants.

121.   Floyd County's policies, customs or patterns of practice, including a failure to adequately train its employees, were the moving force behind the individual FCPD Defendants' constitutional violations.

122.   As a direct and foreseeable consequence of the deficient municipal policies, customs, or patterns and practices as described above, Plaintiff was wrongfully arrested, prosecuted, convicted, and incarcerated, and suffered physical, emotional, psychological, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

## COUNT X

### 42 U.S.C. § 1983 CLAIM FOR MUNICIPAL LIABILITY FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS UNDER *MONELL V. DEP'T OF SOCIAL SERVS. OF THE CITY OF NEW YORK*, 436 U.S. 658 (1978)

(Against Defendant Floyd County – Office of Coroner Deficiencies)

123.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

124.   The Floyd County Coroner's Office was at all times relevant to this Complaint an entity controlled and funded by Floyd County, Georgia.

125.   Upon information and belief, Defendant Floyd County delegated the rules, procedures and training that applied to the Coroner's Office to the Coroner.

In the alternative, Plaintiff alleges that Coroner Craig Burnes was the official and final policymaker for the Floyd County Coroner's Office.

126.   Either through delegation to Coroner Craig Burnes or because Burnes himself was the final policymaker for the Floyd County Coroner's Office, the acts and omissions of Burnes as Coroner of Floyd County, during the time relevant to this Complaint, constituted the policy, custom, or pattern and practice of Floyd County.

127.   Defendant Floyd County, by and through its final policymaker(s), with deliberate indifference, created, promulgated, and maintained the following policies, customs, or patterns which deprived Plaintiff of his constitutional rights, including but not limited to his rights not to be arrested or seized without probable cause, not to be deprived of his liberty without due process of law and a fair criminal proceeding, as follows:

    a.    Failing to properly conduct death investigations when required by law and/or the facts, including but not limited to failing to see that an autopsy be done and/or that a medical examiner be consulted regarding deaths to which criminal liability might attach.

    b.    Failing to make, keep, and maintain notes, reports, and writings related to official acts of the Coroner's Office.

    c.    Following a practice, policy, or custom of falsely reporting that an autopsy had been performed when no such autopsy had been undertaken.

    d.    Following a practice, policy, or custom of conferring

privately with FCPD investigators regarding criminal investigations and falsely shaping official coroner findings and opinions to match investigators' preferred narratives regarding deaths under investigation.

e.   Following a practice, policy, or custom of reckless conduct of death investigations with knowledge that resultant opinions and findings to be shared with law enforcement personnel and those in the judicial system had no scientific basis and were likely to result in unwarranted criminal charges being instituted.

f.   Following a practice, policy, or custom of engaging in official acts in a dishonest fashion and with reckless disregard for the rights and safety of others.

g.   In other respects to be proved through discovery and at trial.

128.   Examining bodies post-mortem and accurate report writing is a day-to-day function of a coroner, including Burnes.

129.   Floyd County's policies, customs or patterns of practice, including a failure to adequately train its employees, were the moving force behind Defendant Burnes' constitutional violations.

130.   Defendant Floyd County condoned and ratified the policies, customs, or patterns and practices of the Floyd County Coroner at issue in this lawsuit, despite having actual knowledge that these policies, customs, or patterns and practices would result in the violation of individuals' rights and cause wrongful arrests and prosecutions.

**COUNT XI**

37

## 42 U.S.C. § 1983 CLAIM FOR MUNICIPAL
## LIABILITY BASED UPON FAILURE TO
## TRAIN AND SUPERVISE FCPD INVESTIGATORS

(Against Defendant Floyd County)

131.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully restated herein and further alleges the following:

132.   Defendant Floyd County had a custom of failing to adequately train and supervise FCPD personnel and officers both prior to and throughout the wrongful prosecution of Plaintiff.

133.   Defendant Floyd County was aware of widespread and serious issues with the gross deficiencies in training and supervision of FCPD investigators and was also aware of the likelihood that citizens' rights would be violated, and wrongful arrests and prosecutions would result.  Despite this knowledge of the need for training and supervision of FCPD investigators, Defendant Floyd County was deliberately indifferent to the need for training and supervision of FCPD investigators.

134.   Throughout Plaintiff's ordeal, both during his wrongful incarceration and in later years during which neither Defendant Floyd County nor the individual Defendants took any action to address the unlawfulness of Plaintiff's conviction or to even allow a re-investigation of the case which resulted in his conviction, Defendant Floyd County was deliberately indifferent to the need for training and

supervision of FCPD investigators.

135.   Upon information and belief, Defendant Floyd County was aware of a widespread pattern of similar constitutional violations by untrained and unsupervised employees of the FCPD and remained deliberately indifferent to the need to train and supervise those employees. Alternatively, the need for training was so obvious and the likelihood that constitutional violations would result due to such lack of training was so great, Defendant Floyd County is subject to municipal liability based upon its deliberate indifference to the glaring need for appropriate training.

136.   Training and supervision of FCPD police detectives and Coroner was grossly deficient and constitutionally inadequate with respect to the following: (i) processing and documenting crime scenes; (ii) memorializing witness interviews and maintaining documentation related to same; (iii) enticing, pressuring, and coercing witnesses to make false statements incriminating others; (iv) identifying, preserving, and producing exculpatory and impeachment evidence as required by law; and (v) allowing officers prone to abusing their roles as police officers and who engaged in acts indicative of a lack of integrity, honesty, and morality to remain in the County's employ.

137.   The activities of police detectives and Coroner, as set forth above, was an everyday, routine occurrence in criminal investigations.

138.    Defendant Floyd County's deliberate indifference to the need for

proper training and supervision of FCPD investigators is evidenced by the

following:

a.    No contemporaneous notes or records exists related to
FCPD investigators interviews of witnesses on the night
of Bowling's shooting.  The lack of recordation of
statements directly contributed to the false charges
instituted against Plaintiff. Floyd County and FCPD
officials were aware of the obvious need for training and
supervision regarding notetaking and record-keeping yet
failed to provide such for FCPD investigators.

b.    FCPD investigators routinely sought and solicited
unreliable statements from jailhouse informants with
knowledge that such statements were untrue and would
result in false and fabricated evidence being used in the
prosecution of innocent persons.  Promises and entreaties
and the lures of illicit benefits were so common that
inmates would openly bargain with investigators for
favors and investigators would indulge those requests in
exchange for sought-after statements and testimony.
Floyd County and FCPD officials were aware of the
obvious need for training and supervision regarding the
solicitation of unreliable statements from jailhouse
informants yet failed to provide such for FCPD
investigators.

c.    FCPD investigators routinely engaged in sexual and
romantic relations with witnesses and others involved in
criminal prosecution processes such that investigators'
motivations were routinely inconsistent with legitimate
investigatory practices.  Both Defendants Battle and
Stewart faced discipline by the FCPD for such
misconduct, yet both continued with careers in law
enforcement with Battle being rehired by the Polk
County Jail and Stewart being rehired by the Floyd
County Jail.  Throughout the time period relevant to this

suit, Floyd County and FCPD officials were aware of the obvious need for training and supervision regarding improper relationships that would compromise FCPD investigators' integrity and judgment yet failed to provide such training and supervision.

d.    Floyd County and FCPD routinely employed officers who were, due to serious character and moral failings, unfit to serve as law enforcement officers. Defendants Battle and Stewart were two such examples, as their personnel files reveal longstanding and pervasive issues involving their judgment, integrity, honesty, and temperament, that rendered them unfit to act as Floyd County law enforcement officers. Complaints and issues involving these officers and others on the FCPD force both post-dated and pre-dated the Bowling investigation and were widely known such that Floyd County and FCPD officials were aware of the obvious need to provide proper training and supervision to FCPD personnel regarding the responsibilities of their office and to remove from employment those unfit to serve.

e.    No proper documentation of the crime scene or collection of evidence was conducted in connection with the underlying investigation. Two sets of photos were taken that were inconsistent with one another, such that confusion ensued, and false narratives were allowed to take root. Critical pieces of evidence were lost, misplaced, or never recovered, e.g., Battle lost the spent casing and live bullet recovered at the crime scene that same night; the bullet that killed Bowling was never recovered from his room; the blue pillow that Battle and Stewart told witnesses was used to muffle the gunshot was "lost" in the trunk of Sergeant Shifflett's car for roughly three months; and FCPD investigators never saw that a GSR test was performed with respect to Bowling. FCPD training and supervision regarding crime scene investigation was not undertaken despite the obvious need for such and knowledge that the failure to provide such training and supervision would cause wrongful

41

prosecutions to be instituted and wrongful convictions to occur.

f.    Substantial exculpatory and impeachment evidence subject to disclosure pursuant to *Brady* was never provided to the DA's Office and thus was not provided to Plaintiff's trial counsel.  Defendant Floyd County and FCPD officials failed to provide training and supervision to FCPD personnel regarding their disclosure obligations despite their knowledge of non-compliance with those obligations and the fact that criminal defendants' constitutional rights would be violated due to the deliberate indifference to the obvious need for training and supervision on this subject.

g.    In other respects to be proved through discovery and at trial.

139.   Plaintiff expressly alleges that the need for training and supervision regarding the areas identified above was so obvious, that Defendant Floyd County was on notice of both the lack of training and supervision and the fact that individuals' rights and safety were at near-certain risk of violation due to those widespread and persistent deficiencies.  Defendant Floyd County was deliberately indifferent to the obvious need for proper training and supervision and the risks that would accompany the continued absence of proper training and supervision.

140.   Plaintiff further alleges, upon information and belief, that Floyd County and FCPD officials were aware of a widespread and pervasive pattern of incidents involving FCPD investigators generally, and Defendants Battle and Stewart specifically, such as to put Floyd County and FCPD officials on notice that

individuals' safety, freedom, and constitutional rights were subject to undue jeopardy as a direct and proximate result of the failure to see that proper training and supervision were implemented.

141.   Floyd County's deficiencies with regard to its policies, customs and practices, including a failure to adequately train its detectives and Coroner, was the moving force behind the individual Defendants' constitutional violations.

## STATE-LAW CLAIMS

## COUNT XII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(Against All Defendants)

142.   Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges the following:

143.   In the manner described more fully above, Defendants caused Plaintiff to be wrongfully arrested, seized, and prosecuted for crimes of which he was completely innocent.  Defendants' conduct was extreme and outrageous and exceeds all bounds usually tolerated by a decent society.

144.   The misconduct of Defendants was undertaken intentionally and in deliberate disregard of a high probability that emotional distress would follow.

145.   As a result of Defendants' misconduct, Plaintiff suffered severe and debilitating emotional distress.

146.    Upon information and belief, Defendant Floyd County has procured policies of liability insurance which provide coverage for the acts and omissions that are the subject of the state-law torts, such that sovereign immunity has been waived.  Additionally, because Defendants acted deliberately, willfully and wantonly, and in bad faith and with malice, they are not shielded from liability by public officer immunity.

147.    Defendant Floyd County is responsible for the tortious conduct of its agents and employees pursuant to the doctrine of *respondeat superior*.

148.    Defendants are jointly and severally liable to Plaintiff for intentional infliction of emotional distress and all damages and injuries as alleged in this Complaint and to be proved through discovery and at trial.

## COUNT XIII

## MALICIOUS PROSECUTION

(Against All Defendants)

149.    Plaintiff hereby incorporates all the foregoing paragraphs as if fully set forth herein and further alleges the following:

150.    In the manner described more fully above, Defendants subjected Plaintiff to an unlawful prosecution without probable cause.  They did so deliberately and with malice.

151.    Defendants caused a criminal proceeding to be instituted against

Plaintiff, which actions were undertaken deliberately, willfully and wantonly and with malice.

152.  No probable cause supported the criminal charges that were instituted against Plaintiff.

153.  The criminal proceedings were ultimately terminated in Plaintiff's favor with the December 8, 2022, Orders granting the EMNT and the Motion for *Nolle Prosequi*.

154.  Defendants' actions were wrongful and constitute malicious prosecution under Georgia law.  Because Defendants acted deliberately, willfully and wantonly, and in bad faith and with malice, they are not shielded from liability by public officer immunity.

155.  Upon information and belief, Defendant Floyd County has procured policies of liability insurance which provide coverage for the acts and omissions that are the subject of the state-law torts, such that sovereign immunity has been waived.

156.  Defendant Floyd County is liable for the tortious acts of its agents and employees pursuant to the doctrine of *respondeat superior*.

157.  Defendants are, jointly and severally liable, to Plaintiff for state-law malicious prosecution and all damages and injuries as alleged in this Complaint and to be proved through discovery and at trial.

45

## **PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff respectfully prays for the following relief:

1.  Compensatory damages from all Defendants, jointly and severally, in an amount to be determined at trial.

2.  Punitive damages from the individual Defendants, jointly and severally, in an amount to be determined at trial, that will deter such conduct by Defendants and other officials and law enforcement officers in the future.

3.  Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988.

4.  Costs of court and interest as allowed by law.

5.  A trial by jury on all contested issues of fact.

6.  Such other and further relief as the Court may deem just and proper.

This the 5th day of December, 2024.

> **STARKS LAW FIRM**
> **By:** */s/ Sam Starks*
> Sam Starks, Esq.
> Georgia Bar No. 676515
> 951 Glenwood Ave., S.E., #2904
> Atlanta, Georgia 30316
> Telephone: 404-343-3332
> Cell Phone: 404-274-1178
> Fax: 404-549-7063
> *Local Counsel for Plaintiff*

**MUELLER LAW FIRM**
**By:** */s/ Wolfgang Mueller*
Wolfgang Mueller
MI Bar No. P43728
41850 W. Eleven Mile, Suite 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(Pending Pro Hac Vice Admission)

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a jury trial in this matter.


**STARKS LAW FIRM**
**By:** */s/ Sam Starks*
Sam Starks, Esq.
Georgia Bar No. 676515
951 Glenwood Ave., S.E., #2904
Atlanta, Georgia 30316
Telephone: 404-343-3332
Cell Phone: 404-274-1178
Fax: 404-549-7063
*Local Counsel for Plaintiff*

Date: December 5, 2024


**MUELLER LAW FIRM**
**By:** */s/ Wolfgang Mueller*
Wolfgang Mueller
MI Bar No. P43728
41850 W. Eleven Mile, Suite 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(Pending Pro Hac Vice Admission)