## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

CAIN STOREY,

Plaintiff,

v.

FLOYD COUNTY, GEORGIA;
DAVID STEWART; CALEB H.
RATCLIFF; MARK WALLACE;
CRAIG BURNES,

Defendants.

CIVIL ACTION NO.
4:24-cv-00288-WMR

## ORDER

This matter is before the Court on Defendant Floyd County's and Defendant Craig Burnes's Motions to Dismiss. [Docs. 44; Doc. 47]. After careful consideration of the parties' arguments, the applicable law, and the record, the Court **GRANTS** in part and **DENIES** in part Defendant Floyd County's Motion to Dismiss and **DENIES** in part Defendant Craig Burnes's Motion to Dismiss.

## I.    BACKGROUND

In his First Amended Complaint ("Amended Complaint") [Doc. 35], Plaintiff alleges the following facts relevant to the instant case.

1

**A. Events of October 18, 1996**

Plaintiff claims that on October 18, 1996, just after 9:00 p.m., he went to the home of his close friend, Brian Bowling, to visit. [*Id*. at ¶ 10]. At the time, Mr. Bowling was 15 years old and Plaintiff was 17 years old. [*Id*. at ¶ 14]. Mr. Bowling's parents, his sister (Amanda Storey), his sister's boyfriend (Kenneth Floyd), and two of Mr. Bowling's friends (Wayne and Charlie Childers) are all alleged to have been in the living room watching television at that time. [*Id*.]. Upon arrival to the home, he went into Mr. Bowling's bedroom, where Mr. Bowling was listening to music. [*Id*. at ¶ 11].

Plaintiff claims that he then showed Mr. Bowling a .38-caliber Smith & Wesson revolver handgun that he had brought with him, which allegedly belonged to Plaintiff's father. [*Id.* at ¶ 12]. Mr. Bowling asked if he had any bullets, Plaintiff produced a bullet he had in his pocket and gave it to Mr. Bowling in response. [*Id*. at ¶ 13]. Mr. Bowling was on the telephone with his girlfriend, Caprice Hiott, during this exchange. [*Id.*]. Mr. Bowling then allegedly took the bullet, loaded it into the gun, and told Ms. Hiott that he was "playing with Josh's gun." [*Id*.].

Plaintiff claims that Mr. Bowling then proceeded to play Russian Roulette with the pistol, but was "cheating" because he could see there was no round in the firing chamber. [*Id*. at ¶ 14]. Plaintiff also proceeded to play Russian Roulette, but claims he was also "dry firing" the gun because he could see there was no bullet in

the firing chamber. [*Id*.]. Plaintiff then handed the revolver back to Mr. Bowling, who spun the chamber and told Ms. Hiott (who was still on the phone) that he was playing Russian Roulette. [*Id.* at ¶ 15]. Plaintiff claims that he urged Mr. Bowling to stop, telling him, "Don't do it man, I think it's the one." [*Id*.] Nonetheless, Mr. Bowling then pulled the trigger, and the handgun fired, sending a bullet into Mr. Bowling's right temple. [*Id.*]. Mr. Bowling's family ran into the bedroom after hearing a loud noise, where they saw Mr. Bowling slumped on his bed, bleeding from his head. [*Id*. at ¶ 16]. Plaintiff exclaimed, "My God, he shot himself in the head!" and then yelled "he just took the gun, put it to his head and shot hisself [sic]!" [*Id*.].

### B. Investigation

Floyd County Police Department ("FCPD") officers and an EMS crew from the Rome Fire Department responded to the scene. [*Id*. at ¶ 17]. Among the officers that responded to the scene was Defendant Dallas Battle[1], who would ultimately be the lead detective in the case. [*Id*.]. Defendant Battle allegedly received field notes from FCPD Officer Carl Lively who had spoken to Plaintiff earlier. [*Id*. at ¶ 18]. Defendant Battle later spoke with Plaintiff, and Plaintiff told Defendant Battle that "Brian had shot hisself [sic]." [*Id.* at ¶ 19]. Defendant Battle then took possession of

---

[1] Defendant Battle is deceased and is represented by the administrator of his estate, Caleb H. Ratliff. [Doc. 3]. This Court will refer to this party as Defendant Battle.

the handgun, the spent casing in the chamber, and a bullet that Plaintiff had given to Kenneth Floyd when emergency personnel were trying to determine the caliber of the bullet involved in the incident. [*Id*. at ¶ 20].

That night, while Mr. Bowling was in the hospital, Plaintiff was taken to the FCPD, where he was interrogated. [*Id*. at ¶ 21]. The interrogation was not recorded, and there were no notes or reports to reflect the interrogation. [*Id*.]. Plaintiff was allegedly administered a gunshot residue test ("GSR"), which came back negative, but Plaintiff claims that no GSR test was ever requested for Mr. Bowling. [*Id*. at ¶ 22].

On October 20, 1996, Plaintiff claims that Ms. Hiott was interviewed by Defendant Battle and Defendant Mark Wallace (a FCPD officer), during which she told them that Mr. Bowling's last statement to her was that he was playing Russian Roulette. [*Id*. at ¶ 23]. Ms. Hiott also told the police that Mr. Bowling's sister, Amanda, told her that Mr. Bowling shot himself in the head. [*Id*.].

That same day, Defendant Battle, Defendant Wallace, and Defendant Craig Burnes—the elected coroner—allegedly met at the funeral home,[2] where Mr. Bowling's body was sent from the hospital after his death. [*Id*. at ¶ 25]. Defendant Burnes did not possess a medical degree, did not order an autopsy to be performed,

---

[2] Defendant Burnes states in his Motion to Dismiss that only Defendant Burnes and Defendant Battle were present at the funeral home. However, at this stage of proceedings, we must presume all facts presented by Plaintiff are true. *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

and did not contact a medical examiner to consult on the case. [*Id.* at ¶ 26]. Defendant Wallace and Battle, with Defendant Burnes, allegedly agreed to have Burnes fabricate an opinion that Mr. Bowling's fatal gunshot wound was consistent with a gunshot fired from a distance, which was inconsistent with Plaintiff's version of events. [*Id.* at ¶ 27]. The agreement had the purpose of framing Plaintiff for causing Mr. Bowling's death, evidenced by Defendant Burnes's report. [*Id.*].

Plaintiff claims that Defendant Burnes told the Bowling family that their son's body had been sent to the Georgia Bureau of Investigation's Crime Lab for an autopsy, but it had not. [*Id.* at ¶ 28]. Plaintiff claims that this was a "habit" of Defendant Burnes from 1996-1998. [*Id.*]. Nonetheless, Defendant Burnes billed the Bowling family approximately $7,000 for the never-performed autopsy. [*Id.*]. Additionally, Defendant Burnes placed rods in the entrance and exit wounds in Mr. Bowling's skull in an "amateurish 'experiment'" to determine the path of the bullet, despite having no training or expertise in ballistics, forensic pathology, or body kinematics to provide a technical foundation for the experiment. [*Id.* at ¶ 29]. Pursuant to his alleged agreement with Defendants Battle and Wallace, Defendant Burnes stated that the fatal gunshot was not "close-contact," which would be indicative of an accidental shooting as described by Plaintiff. [*Id.* at ¶ 30].

On October 20, 1996, Defendants Battle and Wallace allegedly interrogated Plaintiff again for multiple hours at the FCPD. [*Id.* at ¶ 31]. Plaintiff, then age 17,

was taken into police custody without the benefit of counsel or a parent, despite having repeatedly told the detectives that Mr. Bowling had shot himself in the head while playing Russian Roulette. [*Id*.]. Defendants Battle and Wallace multiple times had promised that if Plaintiff just admitted that he accidentally shot his friend, he would not be charged with murder and the case would be closed. [*Id*. at ¶ 32]. Plaintiff claims that he finally acquiesced, stating that he shot Mr. Bowling. [*Id*.]. Despite the detectives' promise to close the case, Plaintiff was immediately arrested for involuntary manslaughter. [*Id*. at ¶ 34].

Plaintiff asserts that Defendant Battle and Defendant David Stewart (another FCPD officer) fabricated a motive that Mr. Bowling's death was not an accident, but rather the penalty for "snitching" on Plaintiff and his friend, Darrell Clark, who Defendants Battle and Stewart claimed were members of a gang called the Free Birds. [*Id*. at ¶ 36]. Allegedly, Defendants Battle and Stewart "planted the seeds" of a revenge murder with the Bowling family, even having the family authorize the exhumation of Mr. Bowling's casket to review a letter placed in the casket by Joseph Wilkins, a friend of Mr. Bowling. [*Id*. at ¶ 37]. Plaintiff claims that the letter was a fond remembrance, and stated, "*Bran, we're going to miss you. Fly high! With sweet love, the Free Birds. P.S. See you at the Crossroads!*" [*Id*.]. Plaintiff claims that Defendants Wallace and Battle, along with Captain Tommy Shiflett and Sergeant Greg Carney, were present at the exhumation. [*Id*. at ¶ 38]. Defendant Battle took

possession of Joseph Wilkins's letter, and Defendants Battle and Wallace allegedly conspired to alter the letter to provide a possible motive to the killing in their efforts to frame Plaintiff for the crime. [*Id.* at ¶ 39]. Defendant Battle supposedly added to the letter the term "NARCS" with a diagonal line through it to represent the message of "Don't be a rat to the police." [*Id.* at ¶ 40]. Defendant Battle did not disclose his alteration of the letter to the prosecutor assigned to Plaintiff and Mr. Clark's case before trial. [*Id.* at ¶ 41].

With the altered letter, Defendants Battle and Stewart had a created a motive for the killing which they could present to the jury. [*Id.* at ¶ 42]. Allegedly, Defendants Battle and Stewart then spread rumors that the Free Birds was a gang to which Plaintiff and Mr. Clark belonged, and that the letter was a "calling card" or a message of retribution. [*Id.* at ¶ 43]. Plaintiff alleges that those rumors fueled the idea that Mr. Bowling was killed by Plaintiff and Mr. Clark because he was a "rat" who "snitched" to the police in connection with the theft of a safe and money from Plaintiff's father's house three weeks earlier. [*Id.*].

Plaintiff further alleges that Defendants Battle and Stewart also threatened and coerced Angela Bruce, a single mother, to provide a fabricated testimony that she heard Plaintiff and Mr. Clark flaunting the murder. [*Id.* at ¶ 44]. Ms. Bruce testified that Plaintiff and Mr. Clark were at her house a few months after Mr. Bowling's death. [*Id.*]. Ms. Bruce told investigators that Plaintiff and Mr. Clark "bragged" about

how they placed a pillow over Bowling's head and shot him "execution style," because the Free Birds gang "did not let anyone out alive." [*Id.*]. Plaintiff claims that only two of the many interviews with Ms. Bruce were actually recorded. [*Id.* at ¶ 45]. Defendants Battle and Stewart allegedly told Ms. Bruce that they were aware of a party she held in February 1997, where there was underage drinking, which they leveraged to force her testimony. [*Id.* at ¶ 46]. Defendants Battle and Stewart visited Ms. Bruce at her house several times, often late at night, to threaten her with losing custody of her minor children if she did not cooperate. [*Id.*]. Allegedly, Defendant Battle also coerced her into a sexual relationship during the investigation, a fact that Plaintiff claims Defendant Battle did not disclose to the prosecutor before trial. [*Id.*].

Plaintiff alleges that Defendants Battle and Stewart also coerced Ms. Bruce into implicating Mr. Bowling's 15-year-old girlfriend, Ms. Hiott. [*Id.* at ¶ 47]. Ms. Bruce provided testimony that Plaintiff bragged that while Ms. Hiott kept Mr. Bowling on the phone, Plaintiff sent Mr. Clark a code, via a pager, to let him know Mr. Bowling was home so that they could carry out the killing. [*Id.*] This statement was supposedly made on May 22, 1997, and provided the catalyst to support arrest warrants for Plaintiff and Mr. Clark for charges of murder and conspiracy to commit murder. [*Id.* at ¶ 49]. Plaintiff contends that Ms. Bruce's story regarding Ms. Hiott story was completely false, was fabricated, and was manufactured by Defendants Battle and Stewart to create probable cause for the subsequent arrests of Plaintiff and

Mr. Clark. [*Id.* at ¶ 48]. Plaintiff also claims that Defendants Battle and Stewart intentionally withheld from the prosecutor several witness statements that contradicted the narrative they created, as well as reports and field notes by FCPD officers that supported Plaintiff's "accidental shooting while playing Russian Roulette" narrative. [*Id.* at ¶ 50].

Plaintiff additionally alleges that Defendants Battle and Stewart sought out Wayne and Charlie Childers, both of whom were at the Bowling house at the time of the murder, but had not been interviewed previously. [*Id.* at ¶ 51]. Defendants Battle and Stewart both knew that Charlie Childers suffered from a hearing impairment, had never learned American Sign Language ("ASL"), and could only read at approximately a second-grade level. [*Id.* at ¶ 52]. Defendants Battle and Stewart also allegedly were aware that Wayne Childers was illiterate. [*Id.*]. Because neither individual knew ASL, Wayne and Charlie Childers could only communicate with basic "home signs" that the Childers family had developed to help communicate with one another. [*Id.*]

After two meetings with Wayne and Charlie Childers on May 26, 1997, Defendants Battle Stewart allegedly claimed that Charlie Childers saw Mr. Clark run in front of the Bowling residence immediately after the shooting. [*Id.* at ¶ 53]. The entirety of Charlie Childers's story and identification was fabricated by Defendants Battle and Stewart, as Charlie Childers allegedly did not see anyone running in front

of the house that evening. [*Id.* at ¶ 54]. Charlie Childers's purported identification of Mr. Clark on a photo lineup was used at trial by the prosecution through Defendant Battle's testimony, which Plaintiff claims "cemented" Mr. Clark's presence and role in the killing. [*Id.* at ¶ 55].

### C. Conviction, Vacation, and Beyond

On January 19, 1998, Plaintiff and Mr. Clark were convicted of murder and conspiracy to commit murder, and the two were later sentenced to serve life in prison. [*Id.* at ¶ 56]. Plaintiff claims these convictions were a result of Defendants' fabricated evidence and withholding of material exculpatory and impeachment evidence. [*Id.*].

Following years of unsuccessful appeals, podcasters and documentary filmmakers Susan Simpson and Jacinda Davis conducted an independent investigation into the case. [*Id.* at ¶ 58]. The investigation allegedly revealed evidence supporting the allegations made by Plaintiff throughout his Amended Complaint, including evidence pertaining to the coercion of Ms. Bruce, Defendant Battle's sexual relationship with Ms. Bruce, the falsified report by Charlie Childers, alterations of the Joseph Wilkins letter, crimes committed by Defendant Burnes, and more. [*Id.* at ¶ 59].

On December 8, 2022, Plaintiff's Extraordinary Motion for New Trial and a similar motion filed by Mr. Clark were granted in Floyd County. [*Id.* ¶ 60]. The

Floyd County court vacated Plaintiff's convictions and dismissed his criminal charges based upon the newly discovered evidence. [*Id.*]. Plaintiff was wrongful incarcerated in jail and prison for over 26 years. [*Id.* at ¶ 61]. Plaintiff argues that Defendants' misconduct, as set forth in his Amended Complaint, was a direct and proximate cause of Plaintiff's related injuries and damages. [*Id.* at ¶ 62].

On December 5, 2024, Plaintiff filed the instant case in the Northern District of Georgia, Rome Division. [Doc. 1]. And, on January 24, 2025, Defendant Floyd County filed its first Motion to Dismiss. [Doc. 24]. In response, Plaintiff filed his First Amended Complaint on February 3, 2025. [Doc. 35]. *See* Fed. R. Civ. P. 15(a)(1)(B) ("A party may amend its pleading once as a matter of course … 21 days after service of a motion under Rule 12(b)[.]"). On the same day, Defendant Burnes filed his Motion to Dismiss, likely unaware Plaintiff had filed is Amended Complaint. [Doc. 38]. Although Plaintiff had already amended his Complaint, he still filed his response to Floyd County's Motion to Dismiss on February 7, 2025. [Doc. 39].

One week later, on February 14, 2025, Defendant Floyd County filed its Motion to Dismiss the First Amended Complaint. [Doc. 44]. Defendant Burnes filed his Motion to Dismiss the First Amended Complaint just three days later. [Doc. 47]. Plaintiff filed his Response to both motions on February 27, 2025. [Docs. 57; 58]. Defendant Floyd County filed its Reply on March 7, 2025. [Doc. 60]. Defendant

Burnes filed his reply on March 13, 2025. Additionally, on June 30, 2025, the Court heard arguments on Defendants' pending motions (the "Hearing"). [Doc. 68].

## II.    LEGAL STANDARD

Defendants have moved to dismiss Plaintiff's claims based on Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) allows a party to move to dismiss an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "A district court considering a motion to dismiss shall begin by identifying conclusory allegations that are not entitled to an assumption of truth . . . ." *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). Next, a court must "accept[ ] the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## III.    DISCUSSION

### A. Defendant Floyd County's Motion to Dismiss

#### i.    Municipal Liability Claims Against Floyd County

Plaintiff asserts three *Monell* claims[3] against Floyd County pursuant to 42 U.S.C. § 1983, which Defendant contends in its Motion should be dismissed. To hold a county liable under § 1983, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the county had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). A plaintiff can establish that the municipality had an unconstitutional custom, policy, or practice under Monell in one of three ways: (1) identifying an official policy; (2) identifying an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identifying a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights. *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

"Because a county rarely will have an officially-adapted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is 'the moving force behind the constitutional violation[.]'" *Grech v. Clayton Cnty.*,

---

[3] In *Monell v. Dep't of Soc. Servs. of City of New York*, the United States Supreme Court held that local governing bodies can be sued directly under 42 U.S.C. § 1983. 436 U.S. 658, 690 (1978). Such claims against counties are often referred to simply as *Monell* claims or *Monell* liability, and will be referred to as such in this Order.

335 F.3d 1326, 1329 (11th Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). To successfully identify an unofficial custom, a plaintiff must additionally show that the practice is so "longstanding and widespread" that it is "deemed authorized by the policymaking officials because they must have known about it and failed to stop it." *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (quoting *City of Canton*, 489 U.S. at 389). Regarding both official policies and unofficial customs, a plaintiff must show the county has "authority and responsibility" over the governmental function at issue and identify the officials who "speak with final policymaking authority" for the county concerning the act that caused the alleged constitutional violation. *Grech*, 335 F.3d at 1329 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). And, as for final policymaker liability, "[o]nly those municipal officials who have final policymaking authority may subject the municipality to section 1983 liability…[,]" and that determination is governed by state law. *Chabad Chayil, Inc.*, 48 F.4th at 1229.

As Plaintiff has alleged Defendant Floyd County is liable under *Monell* based upon several different theories, the Court will analyze each in turn. In its Motion, Defendant Floyd County argues primarily that Plaintiff has failed to sufficiently plead facts which plausibly allege a custom, policy, or pattern and practice under *Monell* and that the claims are ripe for dismissal pursuant to Rule 12(b)(6). [Doc. 44-1 at 11]. Because this matter is before the Court on a motion to dismiss, the Court

must accept Plaintiff's reasonable inferences as true. A claim has facial plausibility when the court can reasonably infer from the claim that the alleged misconduct in fact occurred. *Keating*, 598 F.3d at 762; *Iqbal*, 556 U.S. at 678.

### a. Custom or policies within FCPD.

Count IX of the Amended Complaint alleges municipal liability for deprivation of constitutional rights under *Monell* as a result of deficiencies in the FCPD. [Doc. 35 at 34]. In his Amended Complaint, Plaintiff alleges that the Chief of Police of the FCPD was a final policymaker for the County, and the acts and omissions of the Chief constitute a policy, custom, or pattern of Defendant Floyd County. [Doc. 35 at ¶ 117]. Plaintiff also references various "policies, customs, or patterns" of the County which deprived Plaintiff of his constitutional rights. [Doc. 35 at ¶ 118]. And, Plaintiff contends that Floyd County's alleged customs or polices were the moving force behind Plaintiff's wrongful conviction. [Doc. 35 at ¶ 124].

More specifically, Plaintiff alleges that Floyd County deprived him of his constitutional rights by: (1) "encouraging, promoting, ratifying, and condoning FCPD investigators to improperly investigate in various respects[;]" (2) "creating, promulgating, ratifying, and condoning policies, practices, and customs allowing and encouraging officers to solicit false witness statements[;]" and (3) "creating, promulgating, ratifying, and condoning policies, practices, and customs which encouraged officers not to maintain adequate investigation files and documentation."

[*Id*. at ¶ 118]. Throughout the Amended Complaint, Plaintiff alleges additional facts surrounding Plaintiff's allegedly coerced confession, the alleged conspiratorial agreement regarding the gunshot distance, the alleged fabrication of a homicide theory, and other instances of coercion and falsification of evidence by specific officers. [Doc. 35]. Moreover, Plaintiff contends that Defendant Floyd County "condoned and ratified the policies, customs, or patterns and practices" of the investigators handling Mr. Bowling's case, while having actual knowledge that the investigators "routinely violated individuals' rights and took actions that caused wrongful arrests and prosecutions." [*Id*. at ¶ 121].

Count IX of Plaintiff's Amended Complaint essentially contains allegations pertaining to deficiencies in the FCPD investigation as they related to Mr. Bowling's death, and that Floyd County ratified and condoned these deficiencies, which ultimately led to violations of Plaintiff's constitutional rights. [*Id*. at ¶¶ 118, 120, 121]. In addition, during the Hearing, Plaintiff's counsel brought to the attention of the Court that other suits – with plaintiffs who were also convicted of crimes investigated by Defendants, and had their sentences vacated under similar circumstances – will soon be filed in the Northern District.

The Court agrees with Defendant Floyd County that many of the allegations from Plaintiff are conclusory. However, Plaintiff has alleged that Defendant Floyd County knew of and did not put a stop to the pattern and practice of misconduct by

16

FCPD officers, which in turn violated Plaintiff's constitutional rights. Indeed, Plaintiff must eventually show that such a longstanding and widespread policy exists; it is possible, given what Plaintiff has alleged, that he may be able to do so. In any event, it would be premature to determine whether Plaintiff's *Monell* claim should survive without first allowing discovery to proceed.

As Plaintiff has pled facts sufficient to allege liability at this stage of the proceedings, the claim survives dismissal. The Court will allow Plaintiff to proceed with discovery as to Count IX to build potentially a factual record that supports his assertion that Defendant Floyd County condoned, ratified, encouraged, or promulgated a widespread culture of misconduct that resulted in an unconstitutional unofficial policy or custom.[4]  Thus, Defendant Floyd County's Motion to Dismiss as to Count IX is DENIED.

### b.  Failure to train and supervise within FCPD.

Count XI alleges municipal liability based on failure to train and supervise FCPD officers. In the Amended Complaint and Response to Defendant Floyd County's Motion to Dismiss, Plaintiff argues that a single incident may be sufficient establishing a custom or policy that can lead to municipal liability. [Docs. 35 at ¶ 134-44; 58 at 12].

---

[4] However, the Court cautions Plaintiff that without a fruitful discovery on this issue, the claim may warrant dismissal at the summary judgment stage.

There are only "limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton*, 489 U.S. at 387. In fact, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In *Canton*, the Supreme Court hypothesized that there may be situations where "the need for more or different training is so obvious, and the inadequacy [of the training is] so likely to result in the violation of the constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. In that case, the Court provided an example: if a city armed its officers knowing "to a moral certainty" that officers would use their firearms to apprehend fleeing felons, the need to train officers on the use of deadly force would be "so obvious" that a failure to do so would illustrate deliberate indifference, even in the context of a single incident. *Id.*; *see also Velma v. Gruler*, 803 Fed. Appx. 872, 882. Notably, neither the Supreme Court nor the Eleventh Circuit has ever applied the single incident liability exception. *Velma*, 803 Fed. Appx. at 883.

In the instant case, the Court agrees with Defendant that Plaintiff does not allege the narrow type of factual scenario hypothesized by *Canton*. *See Canton*, 489 U.S. at 390. Plaintiff alleges that Defendant Floyd County failed to train its employees on their legal obligations regarding the handling and disclosure of

evidence and interrogation techniques. [Docs. 58 at 19; 35 at ¶¶ 118, 130, 132]. This factual scenario is unlike that which was presented in *Canton*, as it is not "so obvious" that an alleged failure to train in this regard will result in a violation of constitutional rights.

Not only do Plaintiff's allegations fail under *Canton*'s single incident standard, but also, the factual focus of Plaintiff's allegations of deliberate indifference are substantively inadequate. "[T]he focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Canton,* 498 U.S. at 390. To that end, Plaintiff's narrative in the instant case is essentially that a group of rogue officers have been intentionally fabricating evidence to convict innocent people; there is likely no training to correct such behavior, nor does Plaintiff provide any proposed method to do so.

Plaintiff's Amended Complaint lacks allegations concerning the nature of the County's training program or the manner in which the program was deficient. Instead, Plaintiff presents conclusory allegations of the existence of a policy or custom adopted by Defendant Floyd County which resulted in violations of his constitutional rights. It is clear that Plaintiff has failed to provide factual specificity to meet the plausibility standard under Rule 12(b)(6), and Plaintiff's allegations do not establish deliberate indifference under the standard for a single incident. Thus, the Court GRANTS Defendant Floyd County's Motion to Dismiss on Count XI.

### c. Custom or policy related to the Office of the Coroner.

Count X alleges municipal liability for deprivation of constitutional rights under *Monell* because of deficiencies in the Office of the Coroner. In his Amended Complaint, Plaintiff argues that Defendant Floyd County delegated tasks of the Office of the Coroner to Defendant Burnes, or, in the alternative, that Defendant Burnes was the official final policymaker for the Floyd County Coroner's Office. [Doc. 35 at ¶ 128]. Defendant Floyd County meanwhile contends that Floyd County has no control over the Floyd County Coroner or his Office. [Doc. 44 at 11-12]. The Court agrees that Defendant Floyd County lacks the requisite control over the Office of the Coroner in this case.

"A local government…will be liable under section 1983 only for acts for which the local government is actually responsible." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001). The Eleventh Circuit answered the question of whether local governments are responsible for sheriffs in *Grech v. Clayton County*. 335 F.3d at 1334. In that case, the Eleventh Circuit concluded that the Georgia Constitution[5] "has made the sheriff a constitutionally protected office independent from the defendant [county]. . . ." *Id.* The Eleventh Circuit further opined that a defendant

---

[5] Whether a sheriff was considered a final policymaker for § 1983 purposes is a "federal question…guided by state law." *Grech,* 335 F.3d at 1330 ("Thus, the appropriate inquiry under federal law is whether defendant [county], under Georgia law, has control over the Sheriff in his law enforcement function…"). The same logic applies here.

county "cannot be held liable for the tortious actions of the sheriff or his deputies in performing their law enforcement activities." *Id.* at 1337 (citing W*ayne County Bd. of Comm'rs v. Warren*, 236 Ga. 150, 152 (1976) ("[A] county has no liability in connection with the violations of the civil rights of any person by a county officer.")).

The Eleventh Circuit also determined that sheriffs, by way of the Georgia Constitution and Georgia statute, exist primarily as an entity of the State and not of the county, except in narrow circumstances. *Grech,* 335 F.3d at 1332. In support of its holding, the Eleventh Circuit points to statutes that indicate a lack of county control: for instance, the state controls certain qualifications, salary, and trainings, and sheriffs appoint their own deputies. *Id.* at 1333-38. Those same factors are present with coroners.

Under Georgia law, the Office of the Coroner is created and regulated by the State of Georgia. *See* O.C.G.A. § 45-16-1. In Georgia, the Office of the Coroner is considered a judicial office, and coroners are elected, commissioned, and qualified in the same manner as the clerks of superior courts. *Williams v. Richmond County*, 243 S.E.2d 55, 57 (Ga. 1978). Coroners are, like sheriffs, required by Georgia law to attend a state-approved training course every year, and coroners appoint their own

deputies.[6] *See* O.C.G.A. §§ 45-16-6; 45-16-7(a). And, if these similarities aren't enough, in certain circumstances, the coroner may be required to act in the place of a sheriff. O.C.G.A. § 45-16-5.

To succeed on a *Monell* claim, a plaintiff "must show that the local government entity, here the county, has authority and responsibility over the governmental function in issue . . .". *Craig*, 643 F.3d at 1310. Because Defendant Floyd Couty lacks authority and responsibility over the Office of the Coroner, the County cannot be held liable for Office of the Coroner deficiencies. Therefore, Defendant Floyd County's Motion to Dismiss on Count X is GRANTED.[7]

### ii.    State Law Claims

Sovereign immunity protects the government, both at the federal and state level, from lawsuits to which they do not consent. The doctrine of sovereign immunity was given constitutional status in the State of Georgia in 1974, making all

---

[6] There was some discussion during the Hearing that Defendant Burnes may have actually been an assistant coroner. As the Amended Complaint refers to Defendant Burnes as "coroner," we will consider him as such for purposes of this Order. This would not change the Court's determination, as the Eleventh Circuit noted that Georgia courts have concluded that sheriffs' deputies are "employees of the sheriff and not the county" given that they are appointed by the sheriff. *Grech*, 335 F.3d at 1337.

[7] Plaintiff is allowed to conduct discovery during this case as to any control that Defendant Floyd County had over the Coroner and his office.  Upon proper motion and with additional evidence which supports the Plaintiff's claim that Defendant Floyd County actually exercised such control, the Court might revisit this conclusion.

levels of the state government absolutely immune from suit. *Donaldson v. Dept. of Transp.*, 414 S.E.2d 638, 640 (Ga. 1992); Ga. Const. of 1983 Art. I, § II, Par. IX(e). This includes counties, which are exempt from suit unless "made so by statute." O.C.G.A. § 36-1-4.

Following its codification in the Georgia Constitution, numerous amendments were passed allowing for various waivers of sovereign immunity. *See* Ga. Const. of 1983, Art. I, § II, Par. IX(a-d), (e). In addition to amendments to the Georgia Constitution, the State of Georgia has also waived sovereign immunity through the Georgia Tort Claims Act ("GTCA"). O.C.G.A. § 50-51-20. Because the GTCA did not waive sovereign immunity on behalf of counties and local governments[8], the Georgia General Assembly vested in counties the ability to waive their own sovereign immunity, but only through O.C.G.A § 33–24–51(b). That statute provides that sovereign immunity of counties, municipal corporations, or any other local governmental entity is waived if the local entity has exercised its discretion "to secure and provide insurance to cover liability for damages…arising by reason…or use of any motor vehicle . . . ." § 33–24–51(a). No other statute provides for the waiver of a county's sovereign immunity.

---

[8] "'State' means the State of Georgia and any of its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities, and institutions, but does not include counties, municipalities, school districts, other units of local government, hospital authorities, or housing and other local authorities." § 50-51-22(5).

In this case, Defendant Floyd County argues that it enjoys sovereign immunity on all of Plaintiff's state law claims, while Plaintiff contends that sovereign immunity has been waived by virtue of Defendant's purchase of liability insurance. [Doc. 35 at 2]. Plaintiff asks to continue discovery to determine whether and to what extent Floyd County has purchased liability insurance. [Doc. 58 at 27]. If sovereign immunity has not been waived by Defendant Floyd County, that defense bars Plaintiff's state law claims. *See Woodard v. Laurens Cnty.*, 456 S.E.2d 581, 582-83 (Ga. 1995). The Court has determined it has not been waived.

Indeed, "[a] county's sovereign immunity has been waived pursuant to O.C.G.A. § 33-24-51(b), but only 'to the extent of the amount of liability insurance purchased for the *negligence* of [county] officers, agents, servants, attorneys, or employees arising from the use of a motor vehicle.'" *Woodard v. Laurens Cnty.,* 265 Ga. 404, 405 (Ga. 1995) (quoting *Gilbert v. Richardson* 452 S.E.2d 476, 480) (emphasis added). The statutory waiver of municipal sovereign immunity defined by O.C.G.A § 33-24-51(b) does not apply in the instant case because the liability of Defendant Floyd County is not predicated upon the use of an insured motor vehicle. *See Williams v. Dekalb Cnty.*, 327 F. App'x. 156, 164 (11th Cir. 2009). Additionally, even if this waiver applied, it extends only to acts of negligence, and the state law claims presented by Plaintiff against Defendant Floyd County in this case are intentional torts.

Plaintiff attempts to rest his argument on O.C.G.A. § 36-33-1(a), which provides that a *municipal corporation* may waive its sovereign immunity through § 33-24-51 or where an insurance policy "covers an occurrence for which the defense of sovereign immunity is available." [Doc. 58 at 20]. Plaintiff is correct that if this provision applied, "sovereign immunity is waived to the extent of such liability coverage." *CSX Transp., Inc. v. City of Carden City,* 588 S.E.2d 688, 690 (Ga. 2003). However, the Georgia Supreme Court has made clear that counties, like Defendant, are not municipal corporations, and so this provision necessarily cannot serve as a statutory waiver of immunity. *Miree v. United States,* 249 S.E.2d 573, 578 (Ga. 1978) ("Counties are subdivisions of the state government to which the state parcels its duty of governing the people. . . . On the other hand, municipalities are creatures of the legislature, and their existence may be established, altered, amended, enlarged or diminished, or utterly abolished by the legislature.") (internal citations and quotation omitted)). *See also Marion v. DeKalb Cnty., Ga.*, 821 F. Supp. 685, 688 (N.D. Ga. 1993) ("All land in Georgia is in a county, but the legislature has only made parts of counties municipal corporations.").

Thus, sovereign immunity is not waived and therefore bars Plaintiff's state law claims against Defendant Floyd County. Defendant Floyd County's Motion is hereby GRANTED, and all state law claims against Floyd County are DISMISSED.

## B. Defendant Craig Burnes's Motion to Dismiss

Defendant Burnes first makes two generalized arguments against all of Plaintiff's claims against him. First, he argues that the Amended Complaint is an impermissible "shotgun" pleading, and second, he argues that since of the claims rest upon Defendant Burnes's alleged knowledge regarding Mr. Bowling's death, such a conclusory allegation is insufficient. [Doc. 47-1 at 9]. The Court considers these arguments as it analyzes the claims brought against Defendant Burnes.

### i.    Federal Claims

Plaintiff alleges in his Amended Complaint that Defendant Burnes violated his Fourteenth Amendment rights through civil conspiracy and concealment of exculpatory and impeachment evidence, and that Defendant Burnes violated his Fourth and Fourteenth Amendment rights through fabrication of evidence and malicious prosecution. [*See* Doc. 35, Counts IV, VII, VI and VIII]. Plaintiff brings these claims pursuant to 42 U.S.C. § 1983, and each is addressed below.

### a.    Civil Conspiracy

"A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) (citing *GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1370 (11th Cir.1998)). To prove such conspiracy occurred, a plaintiff must demonstrate that the parties "reached an understanding to deny the plaintiff his … [federal]

rights." *Id.* (internal punctuation and citation omitted). A plaintiff cannot "simply aver in the complaint that a conspiracy existed", and the allegations must be beyond "vague and conclusory." *Fullman v. Graddick*, 739 F.2d 553, 556-557 (11th Cir. 1984). The "linchpin for conspiracy is agreement, which presupposes communication[.]" *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992).

However, "proof of the existence of a § 1983 conspiracy may be based on circumstantial evidence." *Grider*, 618 F.3d at 1260. And, a "plaintiff does not have to produce a 'smoking gun' to establish the 'understanding' or 'willful participation' required to show a conspiracy." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283–84 (11th Cir. 2002) (citing *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990)). Even at the summary judgment stage, only a reasonable inference of a conspiracy based upon the record evidence is sufficient to avoid dismissal of the claim. *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. City of Miami, Fla.,* 637 F.3d 1178, 1191–92 (11th Cir. 2011); *Rowe*, 279 F.3d 1271 at 1284.

Plaintiff alleges in his Amended Complaint that Defendant Burnes engaged in a conspiracy with Defendants Battle, Stewart, and Wallce to knowingly "violate Plaintiff's constitutional rights, including his Fourteenth Amendment rights . . . ." [Doc. 35 at ¶ 82]. Plaintiff further alleges that the aforementioned Defendants "reached an agreement" to "conceal evidence which would have demonstrated that

Plaintiff had nothing to do with Bowling's death." [*Id.*]. Specifically, Plaintiff alleges that the conspiracy began during an October 1996 meeting between Defendants Burnes, Battle, and Wallace at a funeral home where they examined Mr. Bowling's body. [*Id.* at ¶ 25]. It was during this meeting, according to Plaintiff, that Defendant Burnes communicated to Defendant Battle the fabricated contention that the gunshot wound on Mr. Bowling could not have been self-inflicted. [*Id.* at ¶ 27].

Defendant Burnes argues in his Motion that Plaintiff's Amended Complaint is devoid of sufficient facts to state a cognizable claim. Defendant Burnes asserts that Plaintiff's allegations, which demonstrate only "minimal contacts between Burnes and the other Defendants … without making any allegation as to the content of the contacts[,]" is insufficient to assert a conspiracy occurred. [Doc. 47-1 at 13]. Defendant also asserts that without any factual allegations that suggest an agreement between the parties, the allegation of any such conspiracy is conclusory. [*Id.*]. Plaintiff responds that because the Amended Complaint adequately sets forth the circumstances surrounding the conspiratorial agreement that Defendants Wallace, Battle, and Burnes engaged in to "fabricate the coroner's medical opinion that the gunshot wound was from a distance," this is sufficient to avoid dismissal. [Doc. 57 at 19]. The Court agrees.

Plaintiff has gone beyond simply stating that a conspiracy occurred; he has articulated an exact date in time, where a meeting between at least two of the

Defendants alleged occurred, and where the conspiracy likely took place. Plaintiff does not merely aver that a conspiracy existed, and he provides more than a conclusory allegation that a conspiracy necessarily occurred. Defendant Burnes may well be correct that a conspiracy did not occur, but he may move to dismiss the claim again at the summary judgment stage if the record evidence supports his position.

To the extent that Defendant Burnes raises the intra-corporate conspiracy doctrine, it does not bar Plaintiff's civil conspiracy claim. "The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036 (11th Cir.2000) (en banc). "Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.* This doctrine has been extended "not only to private corporations but also to public, government entities." *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000).

The Eleventh Circuit has held that the intra-corporate conspiracy doctrine bars civil conspiracy claims when all the alleged co-conspirators are a part of the same governmental entity. In one case, the Eleventh Circuit dismissed a plaintiff's civil conspiracy case under this doctrine where all defendants worked in the same district attorney's office because the plaintiff had "not alleged that [a defendant] conspired

with anyone outside of the District Attorney's office." *Rehberg v. Paulk*, 611 F.3d 828, 854 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012). The Eleventh Circuit has barred a civil conspiracy claim on the same grounds where both defendants were law enforcement officers within the same police department. *See Grider*, 618 F.3d at 1261. And, the Eleventh Circuit has previously determined that a city manager and the chief of the same city's fire department, as city employees, could not conspire pursuant to the intra-corporate conspiracy doctrine as there were "no outsiders" involved. *Denney v. City of Albany*, 247 F.3d 1172, 1191 (11th Cir. 2001).

The question before this Court is whether Defendant Burnes, in his position as coroner, is considered a part of the same entity as the other Defendants he allegedly conspired with. Defendant Burnes asserts that he and Defendants Battle, Stewart, and Wallace were "employees and officials of Floyd County" and therefore, part of the same entity. [Doc. 47-1 at 15]. But, this is inaccurate; those Defendants who are officers with the FCPD are certainly a part of the same county entity, but coroners like Defendant Burnes are not.

As discussed in the previous section of this Order, the Eleventh Circuit has previously determined that sheriffs, by way of the Georgia Constitution and Georgia statute, exist primarily as an entity of the State and not of the county. *Grech,* 335 F.3d at 1332. And, many of the same factors the Eleventh Circuit relied upon in reaching its holding (state control of qualifications, salary, and trainings, and sheriff

30

control over hiring and firing deputies) are present with coroners. *Id.* at 1333-38. Those same factors apply in considering whether all of the individual Defendants are a part of the same entity. *See* O.C.G.A. §§ 45-16-5, *et. seq.* Because the Coroner's Office is not a county office, it cannot be said that FCPD officers are a part of the same entity as an employee in the coroner's office, least of all the coroner himself.

Just as the Office of the Coroner is its own entity and exists independent of the county, Defendant Burnes, as coroner himself, cannot be considered a part of the "same entity" as the other Defendants. Therefore, as the intra-corporate conspiracy doctrine does not bar Plaintiff's claim. Defendant Burnes's Motion is DENIED as to Plaintiff's civil conspiracy claim, which survives.[9]

### b. Fabrication of Evidence

It is well established in the Eleventh Circuit that fabricating incriminating evidence constitutes a violation of constitutional rights and can give rise to liability under § 1983. *Riley v. City of Montgomery, Ala.,* 104 F.3d 1247, 1253 (11th Cir.

---

[9] This Court recognizes that there is no definitive Eleventh Circuit case law on this issue. Defendant Burnes is permitted to conduct limited discovery as to whether he is considered a county employee and may raise this doctrine again at summary judgment if he can provide additional evidence in support.

1997) (citing *Schneider v. Estelle,* 552 F.2d 593, 595 (5th Cir. 1977)).[10] Plaintiff argues in his Amended Complaint that Defendant Burnes knowingly fabricated evidence by creating a "false report" that the fatal gunshot that killed Mr. Bowling was fired from at least 12 to 18 inches from his head. [Doc. 35 at ¶¶ 86-92).

Defendant Burnes argues in his Motion that this allegation that Defendant Burnes's fabricated the report is conclusory and is, therefore, insufficient to survive dismissal. However, Plaintiff does not merely make this allegation in a vacuum; Plaintiff asserts that because Mr. Bowling's wound was self-inflicted, Defendant Burnes had to have *knowingly* fabricated his report to the contrary. [*Id.* at 28]. Further, Plaintiff details Defendant Burnes' agreement with other Defendants to do just that, fabricate Defendant Burnes' opinion and testimony.   As Plaintiff's allegation as to Defendant Burnes's knowledge is not conclusory and could be furthered developed through discovery, Defendant Burnes's Motion is DENIED as to Plaintiff's fabrication of evidence claim, which survives.

### c. Concealment of Exculpatory and Impeachment Evidence

---

[10] All Fifth Circuit decisions handed down before September 30, 1981, were adopted as binding precedent by the Eleventh Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206, 1207 (11th Cir. 1981).

Under *Brady v. Maryland* and its progeny, law enforcement officers have a constitutional duty to disclose exculpatory[11] and impeachment evidence to prosecutors, who then must disclose that information to the defendant. 373 U.S. 83 (1963). Plaintiff has alleged in his Amended Complaint that Defendant Burnes violated his obligations under *Brady* by failing to disclose exculpatory and impeachment evidence. [Doc. 57 at 21-22]. However, Defendant Burnes argues that he is entitled to qualified immunity on this claim. [Doc. 47-1 at 7].

### 1. Qualified Immunity

"[Q]ualified immunity protects government officials performing discretionary functions from the burdens of civil trials and from liability." *McMillian v. Johnson*, 88 F.3d 1554, 1562 (11th Cir.), *opinion amended on other grounds on reh'g,* 101 F.3d 1363 (11th Cir. 1996). Government officials have "the burden to establish that they were acting within their discretionary authority" when raising a qualified immunity defense. *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022). If an official can satisfy this burden, the onus is then on the plaintiff to establish that "the defendant violated a constitutional right" and that "the violation was clearly established." *Christmas v. Harris County*, 51 F.4th 1348, 1354 (11th Cir. 2022) (internal punctuation omitted).

---

[11] Exculpatory evidence includes evidence that is material and favorable to the defendant's case. *See Brady,* 373 U.S. at 88.

The defense of qualified immunity may be raised and considered on a motion to dismiss. *See Chesser v. Sparks,* 248 F.3d 1117, 1121 (11th Cir. 2001). Such a motion may be granted if the "complaint fails to allege the violation of a clearly established constitutional right." *Id.* (citing *Williams v. Ala. State Univ.*, 102 F.3d 1179, 1182 (11th Cir. 1997)).

Here, Defendant Burnes was well within his scope of discretionary authority when he examined Mr. Bowling and produced a report on Mr. Bowling's cause of death and then provided that information to law enforcement. To determine whether a government employee was acting within his discretionary authority[12], the Eleventh Circuit has created a "two-fold" inquiry: "We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Although it may be reasonable to conclude that a violation of a person's constitutional rights "is never a legitimate job-related function or within the scope of a government official's authority or power," courts are to "look to the general nature of the defendant's

---

[12] Because the differences between "discretionary" and "ministerial" acts will be discussed later in this order concerning Plaintiff's state law claims, it is worth noting that the Eleventh Circuit appears to have "abandoned this 'discretionary function / ministerial task' dichotomy" in the qualified immunity context. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) ("[W]e interpret[] the term 'discretionary authority' to include actions that do not necessarily involve an element of choice, and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function." (internal quotations and citation omitted)).

action, temporarily putting aside the fact that it may have been committed . . . under constitutionally inappropriate circumstances." *Id.* at 1266. Certainly, Defendant Burnes's actions were discretionary in nature.

The burden, then, shifts to Plaintiff to demonstrate that Defendant Burnes violated a clearly established constitutional right. Plaintiff has the burden of demonstrating that Defendant Burnes violated his constitutional rights and that, "at the time of the violation, those rights were clearly established in light of the specific context of the case, not as a broad general proposition." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (cleaned up). Plaintiff may show that the "contours of the right" were clearly established in one of three ways: (1) by showing that "a materially similar case has already been decided[,]" prior to Defendant's violation; (2) by pointing to a "broader, clearly established principle that should control the novel facts of situation[;]" or (3) by showing that the conduct involved in the case "so obviously violates the constitution that prior case law is unnecessary." *Terrell v. Smith*, 668 F.3d 1244, 1255-56 (11th Cir. 2012) (internal punctation and citation omitted). And, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wright v. Whiddon*, 951 F.2d 297, 299 (11th Cir. 1992) (citing *Anderson v. Creighton*, 483 U.S. 635 (1987)). "[T]he salient question … is whether the state of the law [at the time of

the alleged violation] gave [Defendant] fair warning that [his] alleged treatment of [Plaintiff] was unconstitutional." *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).

It is undisputed by the parties that a prosecutor's duty to disclose exculpatory evidence under *Brady* is clearly established. [Doc. 47-1 at 18]. Although the Eleventh Circuit has not "explicitly addressed the disclosure duties of the police and other investigators" under *Brady,* investigators "satisfy their obligations under *Brady* when they turn exculpatory and impeachment evidence over to the prosecutor." *McMillian*, 88 F.3d at 1567. And, as *Brady* requires disclosure, it is "clearly established" that police are prohibited from concealing exculpatory or impeachment evidence. *Id.* at 1569. "Thus, pre-existing law in this circuit clearly established that withholding *Brady* material from the prosecutor, and thus preventing its disclosure to the defense, violates an accused's due process rights." *Id.*

As a coroner, Defendant Burnes was certainly aware that his failure to disclose to the prosecutor additional information regarding Mr. Bowling's cause of death could violate Plaintiff's right to a fair trial. If Defendant Burnes did conceal information regarding Mr. Bowling's gunshot wound, it would be the kind of exculpatory information the prosecution would have been required to disclose to

Plaintiff.[13] Defendant Burnes's Motion is DENIED as to Plaintiff's concealment of evidence claim, which survives.

### d. Malicious Prosecution

"To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (emphasis omitted). "[F]or purposes of a § 1983 malicious prosecution claim, the constituent elements of the common law tort of malicious prosecution included: (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Id*. at 881-82 (citing *Uboh v. Reno*, 141 F.3d 1000, 1002-04 (11th Cir. 1998)).

Defendant Burnes argues in his Motion only that he is not liable because he could not have instigated the prosecution of, or otherwise indicted or prosecuted, Plaintiff. [Doc. 47-1 at 22]. Plaintiff responds that that paragraphs 29-30, 91, and 106-109 of his Amended Complaint "detail Burnes' fabrication of evidence to aid in

---

[13] To the extent Defendant Burnes argues as a coroner his duty is not clearly established, the Eleventh Circuit also used the term "investigators" in its Opinion, and Defendant Burnes did serve an investigatory role in Plaintiff's criminal case and affected its outcome. *McMillian*, 88 F.3d at 1567.

the initiation of criminal charges and Plaintiff's ultimate conviction[,]" thereby providing a basis for the claim to survive dismissal. [Doc. 57 at 21].

Indeed, a malicious prosecution claim can be based on fabrication of evidence; as Plaintiff has made sufficient allegations that Defendant Burnes fabricated evidence, his claim survives. *See Riley v. City of Montgomery, Ala.,* 104 F.3d 1247, 1253 (11th Cir. 1997). Additionally, to the extent Defendant Burnes argues that he did not "institute" the prosecution of Plaintiff, the Eleventh Circuit has construed that prong of the malicious prosecution to include, not only those acts that initiate it, but also continue an ongoing criminal prosecution. *Wood*, 323 F.3d at 883. Plaintiff's federal malicious prosecution claim survives, and Defendant Burnes's Motion is DENIED as to this claim.

### ii.   State Law Claims

### a.  Official Immunity

Defendant Burnes contends that he is entitled to official immunity on Plaintiff's malicious prosecution and intentional infliction of emotional distress ("IIED") claims under Georgia Law. [Doc. 47-1 at 20]. In Georgia, "a public officer or employee may be personally liable for his negligent ministerial acts, [but] he may not be held liable for his **discretionary** acts unless such acts are willful, wanton, or outside the scope of his authority." *Gilbert v. Richardson*, 452 S.E.2d 476, 482 (Ga. 1994) (emphasis added).

The Georgia Supreme Court has described the difference between ministerial and discretionary acts:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

*Pearce v. Tucker*, 787 S.E.2d 749, 752 (Ga. 2016) (citation omitted); *see also Common Cause/Ga. v. City of Atlanta*, 614 S.E.2d 761, 764 (Ga. 2005) ("[A] ministerial act is one that is a mandatory fixed obligation for which mandamus will lie to compel performance.") (quotations and citation omitted). Determining whether an action is discretionary or ministerial is dependent upon "the specific actions complained of, not the general nature of the job, and is to be made on a case-by-case basis." *Pearce*, 787 S.E.2d at 752 (quotations and citation omitted). Thus, "[t]he single overriding factor is whether the specific act from which liability allegedly arises is discretionary or ministerial." *Id.* (quotations and citation omitted) (emphasis removed).

In Georgia, "a public officer or employee may be personally liable for his negligent ministerial acts, [but] he may not be held liable for his discretionary acts unless such acts are willful, wanton, or outside the scope of his authority." *Gilbert v. Richardson*, 264 Ga. 744, 752, 452 S.E.2d 476 (1994). A defendant is liable for discretionary acts that involve either actual malice, which involves a "deliberate

intention to do wrong[,]" or actual intent to cause injury, which involves "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999); *West v. Davis*, 767 F.3d 1063, 1072 (11th Cir. 2014). This threshold inquiry is a "question of law for the court to decide." *Wyno v. Lowndes Cnty.*, 305 Ga. 523, 527, 824 S.E.2d 297, 301 (2019).

Defendant Burnes's actions in the instant case are discretionary as they involve his assessment of Mr. Bowling's body and cause of death, which require personal deliberation and judgment. However, as each of the state claims brought by Plaintiff against Defendant Burnes has an element of malice or intent, he is not entitled to qualified immunity.

### b. IIED

To sustain a Georgia IIED claim, a plaintiff must demonstrate four elements: (1) the conduct [of the defendant(s)] was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Cottrell v. Smith*, 788 S.E.2d 772, 780 (Ga. 2016). "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." *Yarbray v. S. Bell Tel. & Tel. Co.*, 409 S.E.2d 835, 838 (1991). Further, a plaintiff must also demonstrate that the

emotional distress manifested physically or mentally and required the victim "to seek medical or psychological treatment" for the claim to survive. *Howerton v. Harbin Clinic, LLC*, 776 S.E.2d 288, 302 (Ga. App. 2015).

Only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," will be considered extreme and outrageous for IIED purposes. *Justice v. SCI Ga. Funeral Servs.*, 329 Ga. App. 635, 639, 765 S.E.2d 778, 782 (2014). The conduct must also "have been directed at the plaintiff in order to be actionable . . ." *Doe v. Roe*, 864 S.E.2d 206, 214 (Ga. App. 2021) (citation and punctuation omitted). And, "even malicious, wilful or wanton conduct will not warrant a recovery for the infliction of emotional distress if the conduct was not directed toward the plaintiff." *Lively v. McDaniel*, 522 S.E.2d 711, 713 (Ga. App. 1999) (internal punctuation omitted) (quoting *Ryckeley v. Callaway,* 412 S.E.2d 826 (Ga. 1992)).

Defendant Burnes contends that because his alleged conduct was not directed at Plaintiff, Plaintiff's IIED claim cannot survive. [Doc. 47-1 at 24]. The Court disagrees. Plaintiff's Amended Complaint alleges actions taken by Defendant Burnes that, if true, likely would be sufficiently outrageous and extreme, the natural result of that conduct, which would be the prosecution of the Plaintiff, particularly

due to the alleged conspiracy he was engaged in with his co-defendants. Therefore, Defendant Burnes's Motion as to the IIED claim against him is DENIED.

### c. Malicious Prosecution

A malicious prosecution claim under Georgia law is almost identical to its federal counterpart. "The elements essential to a cause of action under OCGA § 51-7-40 are: (1) prosecution for a criminal offense; (2) instigated without probable cause; (3) with malice; (4) under a valid warrant, accusation or summons; (5) which has terminated favorably to the plaintiff; and (6) has caused damage to the plaintiff." *Wal-Mart Stores, Inc. v. Blackford*, 449 S.E.2d 293, 294 (Ga. 1994).

Defendant Burnes argues only that, as coroner, he could not have "instigated" the case as required by statute. [Doc. 47-1 at 22]. However, like federal courts, Georgia courts do not apply that prong of the test so stringently; Georgia courts require only that "the criminal prosecution be carried on maliciously" through the actions of the defendant. *Id.* Because Defendant Burnes, if the allegations in the Amended Complaint are true, assisted Defendant officers in continuing the criminal prosecution of Plaintiff maliciously, this claim survives. Defendant Burnes's Motion to Dismiss on this claim is DENIED.

## IV.    CONCLUSION

Accordingly, Defendant Floyd County's Motion to Dismiss [Doc. 44] is **GRANTED** as to Counts X and XI and all state law claims against it. Those claims are **DISMISSED**. The Motion is **DENIED** as to Count IX, which survives.

Additionally, Defendant Burnes's Motion to Dismiss [Doc. 47] is **DENIED**.

**IT IS SO ORDERED**, this 5th day of September, 2025.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE